## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| DALTON DOUGLAS, derivatively on behalf of AGILON HEALTH, INC., | |
| Plaintiff, | Case No.: 1:24-cv-00531 |
| v. | |
| STEVEN J. SELL, TIMOTHY S. BENSLEY, GLENN SOBOTKA, MICHELLE A. GOURDINE, MICHAEL L. SMITH, RONALD A. WILLIAMS, SHARAD MANSUKANI, CLAY RICHARDS, RAVI SACHDEV, RICHARD J. SCHNALL, DEREK L. STRUM, WILLIAM WULF, PRISCILLA KASENCHAK, DIANA L. MCKENZIE, KAREN MCLOUGHLIN, JEFFREY A. SCHWANEKE, and CD&R VECTOR HOLDINGS, L.P., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| AGILON HEALTH, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Dalton Douglas ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant agilon health, inc. ("Agilon" or the "Company"), files this

1

Verified Shareholder Derivative Complaint against defendants Steven J. Sell ("Sell"), Timothy S. Bensley ("Bensley"), Glenn Sobotka ("Sobotka"), Michelle A. Gourdine ("Gourdine"), Michael Smith ("Smith"), Ronald A. Williams ("Williams"), Sharad Mansukani ("Mansukani"), Clay Richards ("Richards"), Ravi Sachdev ("Sachdev"), Richard J. Schnall ("Schnall"), Derek L. Strum ("Strum"), William Wulf ("Wulf"), Priscilla Kasenchak ("Kasenchak"), Diana L. McKenzie ("McKenzie"), Karen McLoughlin ("McLoughlin"), Jeffrey A. Schwaneke ("Schwaneke") (the "Individual Defendants"), and CD&R Vector Holdings, L.P. ("CDR") (collectively with the Individual Defendants and Agilon, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Agilon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Agilon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Agilon's directors and officers from April 15, 2021 through February 27, 2024, both dates inclusive (the "Relevant Period").

2.      In July 2016, Agilon was formed by a private equity firm Clayton, Dubilier, and Rice by the completion of two healthcare acquisitions, which then merged. Thereafter, the California Department of Managed Health Care found the Company to have engaged in noncompliance regarding utilization management. In April 2021, Agilon began a physician partnership with a physician-owned medical group based in Ohio. Following that period, the Company has expanded into new partnerships throughout the United States.

3.      Agilon is a Delaware-incorporated health care and technology company based in Austin, Texas that acts as the intermediary between physician groups. These physician groups provide medical services to senior citizens and Medicare insurers. Agilon takes payments from these insurers and provides fixed payments to physician groups regardless of the services provided to the patients. Agilon maximizes profit by keeping the costs incurred by each patient below what Agilon receives from the government and insurers.

4.      As part of its business model, Agilon estimates and sets reserves to account for medical costs incurred that have not been reported or submitted for payment (the "incurred-but-not-reported" or "IBNR"). Because of the transfer of financial risk to Agilon, investors find it important that the Company tracks and reports utilization rates. If the total cost to provide medical services to the Company's members exceeds the amount of revenue received by Agilon for those members, the Company will suffer negative cash flows. Thus, the Company uses a financial metric to describe the amount earned from medical services revenue after medical service expenses are

3

deducted (the "Medical Margin"). Agilon expects that as the Company's platform matures over time, the Medical Margin will "increase in absolute dollars."

5.      Agilon filed a registration statement Form S-1 with the SEC in connection with its initial public offering ("IPO") on March 18, 2021. The registration statement was then declared effective by the SEC on April 14, 2021 (the "IPO Registration Statement").

6.      Pursuant to the IPO Registration Statement, on or around April 14, 2021, Agilon's common stock began publicly trading on the New York Stock Exchange ("NYSE"). Agilon's common stock trades under the ticker symbol "AGL."

7.      The Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO on April 16, 2021. The prospectus incorporated and formed part of the IPO Registration Statement (the "IPO Prospectus" and, collectively with the IPO Registration Statement, the "IPO Documents").

8.      Pursuant to the IPO Documents, the Company, along with other selling stockholders identified in the Prospectus, sold approximately 53 million shares of Agilon common stock to the public at an offering price of $23.00 per share. According to the Offering Documents, the total proceeds amounted to approximately $1.01 billion to the selling stockholders after applicable underwriting discounts and commissions.

9.      Agilon filed Form S-1 on September 13, 2021, with the SEC in connection with its secondary public offering (the "September 2021 SPO").

10.     The Company filed a prospectus on Form 424B4 with the SEC in connection with the September 2021 SPO on September 13, 2021. The prospectus incorporated and formed part of the registration statement (the "September 2021 Prospectus" and, collectively with the "September

4

2021 Registration Statement", the "September 2021 Offering Documents"). The September 2021 Registration Statement was signed by Defendants Sell and Bensley.

11.     The Company announced the pricing of the September 2021 SPO, and represented to investors that it would sell 17 million shares of Agilon common stock at a price of $24.15 per share. Additionally, Agilon disclosed a 30-day option that the Company would grant for underwriters to purchase up to 10,500,000 additional shares of Company common stock.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements in the IPO Documents and the September 2021 Offering Documents, and in the statements that followed. The IPO Documents and the September 2021 Offering Documents failed to disclose, *inter alia*, that: (i) the Company exaggerated the efficiency of Agilon's business model and thus was unable to provide the cost savings and the mitigation of medical expenses represented to investors; (ii) the Company's purported historical cost savings portrayed to investors in connection with the IPO were short-term effects of the COVID-19 pandemic and therefore not indicative of the cost controls inherent to the Company's aforementioned business model; (iii) due to the foregoing, Agilon suffered from a material, undisclosed risk of higher utilization and medical claims rates once the short-term effects of the pandemic subsided. As a result, Agilon's public statements were materially false and misleading at all relevant times.

13.     Again, Agilon filed documents with the SEC in connection with its second public

offering, which was declared effective by the SEC on May 15, 2023 (the "May 2023 SPO").

14.     The Company filed a prospectus on Form 424B4 with the SEC in connection with the May 2023 SPO on May 17, 2023. The prospectus incorporated and formed part of the registration statement (the "May 2023 Prospectus" and, collectively with the "May 2023 Registration Statement", the "May 2023 Offering Documents"). The May 2023 Registration Statement was signed by Defendants Sell and Bensley.

15.     The Company announced the pricing of the May 2023 SPO, and represented to investors that it would sell 70 million shares of Agilon common stock.

16.     The truth began to emerge on November 2, 2023, when Agilon reported lower than expected third quarter results due to increased utilization and medical costs. Agilon reported a net loss of $31 million for the third quarter and cut its Medical Margin to a range between $455 million and $470 million for its fiscal year ending on December 31, 2023 ("Fiscal Year 2023"). Additionally, Individual Defendants lowered Agilon's 2023 full-year revenue outlook and informed investors that Agilon had increased its IBNR Reserve to account for prior period medical expenses.

17.     On this news, the price per share of Agilon's stock price fell $2.23, or 13.2%, from a closing price of $16.89 on November 2, 2023, to close at a price of $14.66 on November 3, 2023.

18.     The truth continued to emerge on January 5, 2024, when Agilon issued a press release revealing that the Company had suffered dramatically higher prior medical expenses than previously revealed. Again, Agilon further reduced its 2023 Medical Margin and adjusted EBITDA guidance. Specifically, Agilon reduced its Medical Margin and EBITDA outlooks by more than $110 million and $73 million, respectively. This represented a decline of more than

34% from the $550 million Medical Margin the Company had predicted.

19.     Additionally on this day, Agilon announced that Defendant Bensley, Agilon's Chief Financial Officer ("CFO") would retire and be replaced within the year.

20.     On this news, the price per share of Agilon's stock fell $3.45, or 28.6%, from a closing price of $12.08 on January 4. 2024, to close at a price of $8.63 on January 5, 2024.

21.     The truth finally emerged on February 27, 2024, when Agilon issued a press release announcing its fourth quarter financial results for 2023. Agilon's reported 2023 Medical Margin was $299 million. This was $51 million below the midpoint provided on January 5, 2024. Additionally, Agilon reported that increased medical costs would continue. As a result, Agilon revised its 2024 Medical Marged range down to $400-450 million as compared to $560-600 million.

22.     Additionally on February 27, 2024, Agilon hosted an earnings call. During the call, the Individual Defendants admitted that the Company has implemented significant operational changes to address its "data visibility gaps."

23.     On this news, the price per share of Agilon's stock fell $.44 per share, or 7%, from a closing price of $6.48 on February 27, 2024, to close at a price of $6.04 on March 1, 2024.

24.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements regarding the May 2023 Offering Documents. The May 2023 Offering Documents failed to disclose, *inter alia*, that: (i) the Company had suffered

from materially higher utilization and medical claims rates as compared to previous year periods as patients who had delayed elective procedures during the COVID-19 pandemic sought treatment; (ii) the Company's business model had not insulated Agilon from these adverse cost trends, that worsened through the year, and Agilon was actually suffering cost trends that were 3x higher in certain key areas compared to 2022; (iii) due to the foregoing, the Company had suffered over $60 million in excess costs related to the Company's medical services and millions in excess costs related to patient supplements benefits; (iv) thus, the Company lost tens of millions of dollars in prior year development claims; (v) resulting in the Company's Medical Margins and adjusted EBITDA to be artificially inflated and materially misrepresented to the investing public; and (vi) finally, the Company's Medical Margin and adjusted EBITDA guidance, 2024 cash flow guidance, and the 2026 long-term guidance lacked in reasonable basis of fact and thus, was not achievable. As a result, Agilon's public statements were materially false and misleading at all relevant times.

25.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Agilon to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, on May 18, 2023, approximately 9.6 million shares of the Company's common stock were repurchased, costing the Company approximately $199,680,000. As the Company's stock was actually worth $6.04 per share, the price at which it was trading when markets closed on February 27, 2024, the Company overpaid for repurchases of its own stock by over $141 million in total.

26.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls, while four of them engaged in lucrative insider trading, netting proceeds of approximately $14,143,022.

27.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to three different federal securities fraud class action lawsuits, two of which are pending in the United States District Court for the Western District of Texas, Austin Division and one of which is pending in the United States District Court for the Southern District of New York (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

28.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

29.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), and Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

31.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

33.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

**PARTIES**

**Plaintiff**

34.     Plaintiff is a current shareholder of Agilon and has continuously held Company common stock since first purchasing the stock on April 19, 2021.

**Nominal Defendant Agilon**

35.     Agilon is a Delaware corporation with its principal executive offices at 6210 E Hwy 290, Suite 450, Austin, TX 78723. Agilon's shares trade on the NYSE under the ticker symbol "AGL."

**Defendant Sell**

36.     Defendant Sell has served as the Company's CEO, President, and as a Company director since June 2020. He also serves as a member of the Compliance and Quality Committee. According to the Company's Schedule 14A filed with the SEC on April 18, 2024 (the "2024 Proxy Statement"), as of March 31, 2024, Defendant Sell beneficially owned 3,774,968 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $5.84, Defendant Sell owned approximately $22 million worth of Agilon stock as of that date.

37.     For the fiscal year ending December 31, 2023 (the "Fiscal Year 2023"), Defendant Sell received $5,267,036 in total compensation from the Company, including $750,000 in salary, $3,375,043 in stock awards, $1,125,008 in option awards, and $16,985 in all other compensation. For the fiscal year ending December 31, 2022 (the "Fiscal Year 2022"), Defendant Sell received $5,789,157 in total compensation from the Company, including $750,000 in salary, $2,250,018 in stock awards, $2,250,014 in option awards, $523,125 in non-equity incentive plan compensation, and $16,000 in all other compensation. For the fiscal year ending December 31, 2021 (the "Fiscal Year 2021"), Defendant Sell received $1,256,250 in total compensation from the Company, including $750,000 in salary and $506,250 in non-equity incentive plan compensation.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sell made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 14, 2021 | 100,000 | $28.98 | $2,898,000 |

Thus, in total, before the fraud was exposed, Defendant Sell sold 100,000 shares of Company stock on inside information, for which he received approximately $2,898,000 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.     The 2024 Proxy Statement stated the following about Defendant Sell:

Steven J. Sell has served as our Chief Executive Officer and President and director since June 2020. In addition to his current role as Chief Executive Officer and President and director of the Company, Mr. Sell serves as an advisor to several early-stage healthcare companies. Mr. Sell served as President, Chief Executive Officer and Chairman of Health Net, from March 2016 to June 2019 and President, Western Region of Health Net, from November 2008 to March 2016. Mr. Sell received his B.A. from Swarthmore College and holds an MBA from the Stanford Graduate School of Business.

**Defendant Bensley**

40.     Defendant Bensley has served as the Company's CFO since January 2021. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Bensley beneficially owned 364,725 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $5.84, Defendant Bensley owned approximately $2.1 million worth of Agilon stock as of that date.

41.     For the Fiscal Year 2023, Defendant Bensley received $1,750,039 in total compensation from the Company, including $500,000 in salary, $937,529 in stock awards, and $312,510 in option awards. For the Fiscal Year 2022, Defendant Bensley received $2,081,337 in total compensation from the Company, including $500,000 in salary, $625,012 in stock awards, $625,012 in option awards, and $331,313 in incentive plan compensation. For the Fiscal Year 2021, Defendant Bensley received $5,821,031 in total compensation from the Company, including

$480,769 in salary, $687,470 in stock awards, $4,311,643 in option awards, $336,415 in incentive plan compensation, and $4,734 in all other compensation.

42.     The 2024 Proxy Statement stated the following about Defendant Bensley:

Timothy S. Bensley has served as our Chief Financial Officer since January 2021. Previously, Mr. Bensley served as the Chief Financial Officer of Blue Apron Holdings , Inc., from May 2018 to December 2020, Chief Financial Officer at Acosta Sales and Marketing from June 2015 to October 2017, and a variety of finance leadership roles at PepsiCo from July 1986 to April 2015. At PepsiCo, Mr. Bensley's leadership roles included heading Financial Planning and Analysis, Supply Chain Finance and Sales Finance at Frito Lay North America; Senior Vice President of PepsiCo's Global Transformation Group and serving as the Chief Financial Officer of Pepsi-Cola North America and ultimately Chief Financial Officer of PepsiCo Americas Foods.

**Defendant Sobotka**

43.     Defendant Sobotka served as the Company's Chief Accounting Officer from March 2019 until he resigned in May 2022

44.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sobotka made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| November 4, 2021 | 150,000 | $25.19 | $3,778,500 |

Thus, in total, before the fraud was exposed, Defendant Sobotka sold 150,000 shares of Company stock on inside information, for which he received approximately $3,778,500 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Gourdine**

13

45.     Defendant Gourdine served as a Company director from January 2021 until her resignation in December 2022.

46.     For the Fiscal Year 2022, Defendant Gourdine received $64,103 in total compensation from the Company, made up entirely of fees earned or paid in cash. For the Fiscal Year 2021, Defendant Gourdine received $389,987 in total compensation from the Company, including $70,000 in fees earned or paid in cash, $159,988 in stock awards, and $159,999 in option awards.

47.     The Schedule 14A the Company filed with the SEC on April 11, 2022 ("2022 Proxy Statement") stated the following about Defendant Gourdine:

> Michelle A. Gourdine, M.D. has served as a director of agilon health since January 2021. In addition to her role as director of agilon health, Dr. Gourdine also serves as Senior Vice President, Population Health and Primary Care for the University of Maryland Medical System, Clinical Assistant Professor at the University of Maryland School of Medicine and Senior Associate faculty at the Johns Hopkins Bloomberg School of Public Health. Dr. Gourdine also serves on the board of Horizon BlueCross Blue Shield of New Jersey. Previously, Dr. Gourdine served on the boards of Maryland Health Benefit Exchange, from April 2016 to December 2017, and LifeBridge Health, from February 2009 to May 2015. Dr. Gourdine is the former Deputy Secretary of Health and Chief Public Health Physician for the state of Maryland from February 2005 to February 2008, and former Health Commissioner for Baltimore County from August 1995 to February 2005. Dr. Gourdine received her B.S. from Tougaloo College and her M.D. from the Johns Hopkins University School of Medicine. We believe Dr. Gourdine is a valuable member of our board because of her experience as an executive in a medical system, as an educator in the fields of medicine and public health, and on other healthcare companies' boards.

**Defendant Smith**

48.     Defendant Smtih served as a Company director from 2017 until his resignation in August 2022. Defendant Smith also served as a member of the Audit Committee.

49.     For the Fiscal Year 2022, Defendant Smith received $47,500 in total compensation

14

from the Company, made up entirely of fees earned or paid in cash. For the Fiscal Year 2021, Defendant Smith received $254,988 in total compensation from the Company, including $95,000 in fees earned or paid in cash and $159,988 in stock awards.

50.     The 2022 Proxy Statement stated the following about Defendant Smith:

Michael Smith has served as a director of agilon health since 2017. Mr. Smith is also the co-founder and Senior Advisor of Cardinal Equity Fund. Mr. Smith also served as Executive Vice President and CFO of Anthem, Inc. from January 1999 until his retirement in January 2005. Mr. Smith joined Anthem in April 1996 as Chief Financial and Chief Operating Officer of Anthem's subsidiary American Health Network. Mr. Smith has served as an advisor to or director for several public and private companies, including Vectren Corporation, Envision Health Care and HH Gregg. For each of the foregoing companies, Mr. Smith served as both a director and chair of the audit committee. Mr. Smith received a degree in Economics from DePauw University. He has also served as the Chair of Indiana Commission for Higher Education and as Chair of Governor Holcomb's Commission for Next Level Teacher Pay. We believe Mr. Smith is a valuable member of our board because of his experience as an executive at a large healthcare company and his financial and investing experience.

**Defendant Williams**

51.     Defendant Williams is a co-founder of Agilon and has served as a Company director and as Chairman of the Board since 2017. Defendant Williams also serves as an Operating Advisor for Defendant CD&R. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Williams beneficially owned 3,564,414 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024, was $5.84, Defendant Williams owned approximately $20.8 million worth of Agilon stock as of that date.

52.     For the Fiscal Year 2023, Defendant Williams received $160,002 in total compensation from the Company, made up entirely of stock awards. For the Fiscal Year 2022, Defendant Williams received $160,060 in total compensation from the Company, made up entirely

of stock awards. For the Fiscal Year 2021, Defendant Williams received $159,988 in total compensation from the Company, made up entirely of stock awards.

53.     The 2024 Proxy Statement stated the following about Defendant Williams:

Ron Williams is a co-founder of our Company and has served as a director and chairman of the board since 2017. Mr. Williams also is chairman and Chief Executive Officer of RW2 Enterprises and serves as an operating advisor to CD&R. Mr. Williams serves on the board of directors of The Boeing Company and Warby Parker and served on the Board of The American Express Company from January 2007 to April 2022, Johnson & Johnson from June 2011 to April 2022 and Envision Healthcare from May 2011 to October 2017. Mr. Williams served as the Chief Executive Officer and Chairman of Aetna Inc. from February 2006 and October 2006 to December 2010 and April 2011, respectively. Mr. Williams also serves as Chairman of The Conference Board and the Peterson Institute for International Economics and served as a director of NAF. Mr. Williams received his B.A. from Roosevelt University and holds an M.S. in Management from MIT Sloan School of Management.

**Defendant Mansukani**

54.     Defendant Mansukani has served as a Company director since 2017. He also serves as the Chair of the Nominating & Governance Committee and as a member of the Compliance and Quality Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Mansukani beneficially owned 1,885,664 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024, was $5.84, Defendant Mansukani owned approximately $11 million worth of Agilon stock as of that date.

55.     For the Fiscal Year 2023, Defendant Mansukani received $245,002 in total compensation from the Company, including $85,000 in fees earned or paid in cash and $160,002 in stock awards. For the Fiscal Year 2022, Defendant Mansukani received $245,060 in total compensation from the Company, including $85,000 in fees earned or paid in cash and $160,060

in stock awards. For the Fiscal Year 2021, Defendant Mansukani received $244,988 in total compensation from the Company, including $85,000 in fees earned or paid in cash and $159,988 in stock awards.

56.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mansukani made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 14, 2021 | 156,250 | $28.98 | $4,528,125 |

Thus, in total, before the fraud was exposed, Defendant Mansukani sold 156,250 shares of Company stock on inside information, for which he received approximately $4,528,125 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

57.     The 2024 Proxy Statement stated the following about Defendant Mansukani:

Sharad Mansukani, M.D. has served as a director since 2017. Dr. Mansukani also serves as a Senior Advisor to TPG, a trustee of the Children's Hospital of Philadelphia, a member of the board of directors of Monogram Health, Inc., Chairman of the board of directors of Convey Health Solutions and a member of The Wharton School Healthcare Policy Board. Dr. Mansukani served as Chairman of the board of directors of Envision Rx Options from 2013 to 2016; a strategic advisor to the board of directors at Cigna Corp. from 2012 to 2015; Vice Chairman, Board of Directors of Health Spring, Inc. from 2007 to 2012; a director of IMS Health Holdings, Inc. from 2009 to 2016; a director of Surgical Care Affiliates, Inc. from 2007 to 2017; as lead director of IASIS Healthcare from 2005 to 2018; and a director of Kindred Healthcare, Inc. from 2015 to 2018. Dr. Mansukani also has served as a Senior Advisor on Medicare's Program Advisory and Oversight Committee to the Secretary of the Department of Health and Human Services; Senior Advisor to the Administrator of the Centers for Medicare and Medicaid Services; and senior vice president and chief medical officer at Health Partners. Dr. Mansukani completed a residency and fellowship in ophthalmology at the

University of Pennsylvania School of Medicine and a fellowship in quality management and managed care at the Wharton School of the University of Pennsylvania. He is a graduate of the Managed Care Executive Program at the Kellogg School of Business.

**Defendant Richards**

58.     Defendant Richards previously served as a Company director from January 2021 until he resigned in June 2023.

59.     For the Fiscal Year 2023, Defendant Richards received $193,455 in total compensation from the Company, including $33,453 in fees earned or paid in cash and $160,002 in stock awards. For the Fiscal Year 2022, Defendant Richards received $230,060 in total compensation from the Company, including $70,000 in fees earned or paid in cash and $160,060 in stock awards. For the Fiscal Year 2021, Defendant Richards received $389,987 in total compensation from the Company, including $70,000 in fees earned or paid in cash, $159,988 in stock awards, and $159,999 in option awards.

60.     The Schedule 14A the Company filed with the SEC on April 14, 2023 ("2023 Proxy Statement") stated the following about Defendant Richards:

> Clay Richards has served as a director of agilon health since January 2021. In addition to his role as director of agilon health, Mr. Richards serves as an operating advisor to CD&R. Mr. Richards also served as co-founder and chief executive officer of naviHealth, Inc. from 2012 to December 2022. Prior to founding naviHealth, Inc., Mr. Richards served in executive roles at Healthways, Inc. Mr. Richards also serves on the board of directors of CareBridge Health, Herself Health and Truxton Trust as well as several non-profit organizations and previously served on the Nashville Health Care Council Board of Directors. Mr. Richards received a B.S. from Washington and Lee University and his J.D. from the University of Mississippi School of Law. We believe Mr. Richards is a valuable member of our board because of his experience as a founder and executive at other healthcare companies.

**Defendant Sachdev**

61.     Defendant Sachdev has served as a Company director since 2017 and as Vice Chairman of the Board since January 2021. Defendant Sachdev also serves as a member of the Compliance and Quality Committee. Defendant Sachdev is a Partner for Defendant CD&R.

62.     The 2024 Proxy Statement stated the following about Defendant Sachdev:

Ravi Sachdev has served as a director since 2017 and as Vice Chairman since January 2021. Mr. Sachdev also serves as a director of Covetrus, Inc., Steve Madden, Inc., Millenium Physician Group, apree health and Gentiva. Mr. Sachdev has served as a Partner of CD&R since June 2015, focusing on the healthcare sector. From November 2010 to May 2015, Mr. Sachdev was a Managing Director and Co-Head of Healthcare Services at J.P. Morgan Chase & Co. Mr. Sachdev received his B.A. from the University of Michigan.

**Defendant Schnall**

63.     Defendant Schnall served as a Company director from 2017 until he resigned in June 2023. During the Relevant Period, Defendant Schnall also served as the co-President at Defendant CD&R.

64.     The 2023 Proxy Statement stated the following about Defendant Schnall:

Richard J. Schnall has served as a director of agilon health since 2017. Mr. Schnall also serves as co-President of CD&R and on the board of directors of Carestream Dental. Mr. Schnall previously served on the board of directors of US Foods and Envision Healthcare. Mr. Schnall worked in the investment banking divisions of Smith Barney & Co. and Donaldson, Lufkin & Jenrette from 1992 to 1996. Mr. Schnall is a graduate of the University of Pennsylvania's Wharton School and holds an MBA from Harvard Business School. We believe Mr. Schnall is a valuable member of our board because of his extensive experience with health-related and other companies, as well as his strong financial and investing experience.

**Defendant Strum**

65.     Defendant Strum served as a Company director from 2017 until he resigned in June 2023. During the Relevant Period, Defendant Strum also served as a partner at Defendant CD&R.

66.     The 2023 Proxy Statement stated the following about Defendant Strum:

Richard J. Schnall has served as a director of agilon health since 2017. Mr. Schnall also serves as co-President of CD&R and on the board of directors of Carestream Dental. Mr. Schnall previously served on the board of directors of US Foods and Envision Healthcare. Mr. Schnall worked in the investment banking divisions of Smith Barney & Co. and Donaldson, Lufkin & Jenrette from 1992 to 1996. Mr. Schnall is a graduate of the University of Pennsylvania's Wharton School and holds an MBA from Harvard Business School. We believe Mr. Schnall is a valuable member of our board because of his extensive experience with health-related and other companies, as well as his strong financial and investing experience.

**Defendant Wulf**

67.     Defendant Wulf has served as a Company director since 2017. Defendant Wulf also serves as the Chair of the Compliance and Quality Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Wulf beneficially owned 449,014 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024, was $5.84, Defendant Wulf owned approximately $2.6 million worth of Agilon stock as of that date.

68.     For the Fiscal Year 2023, Defendant Wulf received $230,002 in total compensation from the Company, including $70,000 in fees earned or paid in cash and $160,002 in stock awards. For the Fiscal Year 2022, Defendant Wulf received $230,060 in total compensation from the Company, including $70,000 in fees earned or paid in cash and $160,060 in stock awards. For the Fiscal Year 2021, Defendant Wulf received $229,988 in total compensation from the Company, including $70,000 in fees earned or paid in cash and $159,988 in stock awards.

69.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wulf made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |

| September 14, 2021 | 15,342 | $28.98 | $444,611 |
| March 15, 2022 | 30,808 | $19.11 | $588,586 |
| March 15, 2023 | 80,000 | $23.82 | $1,905,200 |

Thus, in total, before the fraud was exposed, Defendant Wulf sold 126,150 shares of Company stock on inside information, for which he received approximately $2,938,397 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

70.     The 2024 Proxy Statement stated the following about Defendant Wulf:

William Wulf, M.D. has served as a director since 2017. In addition to his role as director of agilon health, Dr. Wulf was formerly the Chief Executive Officer of Central Ohio Primary Care ("COPC"). COPC is an agilon group partner. Dr Wulf was a founding partner of COPC in 1996 and assumed the role of Chief Executive Officer in 2013 after 25 years as a practicing Internist and COPC Corporate Medical Director. Dr Wulf has also served as an advisor for multiple payers including Anthem, Aetna Inc. and United Healthcare. Dr Wulf has served as board chair of America's Physician Groups and is a director for apree health. Dr Wulf received his B.S. from The Ohio State University and his M.D. from the Medical College of Ohio.

**Defendant Kasenchak**

71.     Defendant Kasenchak served as the Company's Chief Accounting Officer ("CAO") from September 30, 2022, until her resignation on September 15, 2023.

**Defendant McKenzie**

72.     Defendant McKenzie has served as a Company director since February 2023. She also serves as a member of the Audit Committee and the Compensation and Human Capital Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant McKenzie beneficially owned 10,364 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on April 1, 2024, was $5.84, Defendant

McKenzie owned approximately $60,526 worth of Agilon stock as of that date.

73.     For the Fiscal Year 2023, Defendant McKenzie received $405,440 in total

compensation from the Company, including $60,861 in fees earned or paid in cash, $184,570 in

stock awards, and $160,009 in option awards.

74.     The 2024 Proxy Statement stated the following about Defendant McKenzie:

Diana L. McKenzie has served as a director since February 2023. Ms. McKenzie is
a technology advisor, board member, and former Chief Information Officer with
over thirty years of leadership experience gained from growing, scaling, and
transforming global businesses in the Life Sciences and Software Industry with
revenues ranging from $3 billion to $20 billion. Ms. McKenzie served as Workday
Inc.'s first Chief Information Officer from 2016 to 2019. Before Workday,
Ms. McKenzie served in multiple technology leadership roles at Amgen, Inc. from
2004-2016, including the role of Chief Information Officer. Prior to joining Amgen,
she served in various technology leadership roles from 1987 to 2004 at Eli Lilly
and Company. Ms. McKenzie serves on MetLife, Inc., Vertex Pharmaceuticals, and
Paradox boards of directors and as a Special Advisor to Brighton Park Capital. She
received her B.S. degree from Purdue University in 1986.

**Defendant McLoughlin**

75.     Defendant McLoughlin has served as a Company director since July 2021. She also

serves as the Chair of the Audit Committee and as a member of the Compensation and Human

Capital Committee and the Nominating & Governance Committee. According to the 2024 Proxy

Statement, as of March 31, 2024, Defendant McLoughlin beneficially owned 21,299 shares of the

Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on April 1, 2024, was $5.84, Defendant McLoughlin owned approximately

$124,386 worth of Agilon stock as of that date.

76.     For the Fiscal Year 2023, Defendant McLoughlin received $292,502 in total

compensation from the Company, including $132,500 in fees earned or paid in cash and $160,002

in stock awards. For the Fiscal Year 2022, Defendant McLoughlin received $230,060 in total compensation from the Company, including $70,000 in fees earned or paid in cash and $160,060 in stock awards. For the Fiscal Year 2021, Defendant McLoughlin received $315,940 in total compensation from the Company, including $35,000 in fees earned or paid in cash, $120,964 in stock awards, and $159,976 in option awards.

77.     The 2024 Proxy Statement stated the following about Defendant McLoughlin:

Karen McLoughlin has served as a director since July 2021. In addition to her role as director of our Company, Ms. McLoughlin serves on the board of directors of Best Buy Co., Inc. as a member of the audit committee and chair of the finance and investment policy committee. Ms. McLoughlin also serves as a Senior Advisor to McKinsey & Co. Previously, Ms. McLoughlin was the Chief Financial Officer of Cognizant Technology Solutions from 2012 to 2020. Prior to joining Cognizant Technology Solutions in 2003, Ms. McLoughlin served in financial roles for Spherion from 1997 to 2003, Ryder Systems, Inc. from 1994 to 1997, and Price Waterhouse (which is now known as PricewaterhouseCoopers) from 1988 to 1994. Ms. McLoughlin received her B.A. from Wellesley College and her MBA from Columbia University.

**Defendant Schwaneke**

78.     Defendant Schwaneke has served as a Company director since August 2022. He also serves as Chair of the Compensation and Human Capital Committee and as a member of the Audit Committee and the Nominating & Governance Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Schwaneke beneficially owned 35,157 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024, was $5.84, Defendant Schwaneke owned approximately $205,317 worth of Agilon stock as of that date.

79.     For the Fiscal Year 2023, Defendant Schwaneke received $230,002 in total compensation from the Company, including $70,000 in fees earned or paid in cash and $160,002

in stock awards. For the Fiscal Year 2022, Defendant Schwaneke received $135,674 in total compensation from the Company, including $27,391 in fees earned or paid in cash and $108,283 in stock awards.

80.     The 2024 Proxy Statement stated the following about Defendant Schwaneke:

Jeffrey Schwaneke has served as a director since 2022. Mr. Schwaneke served as the Executive Vice President of Health Care Enterprises for Centene Corporation from June to September 2021. From March 2016 through May of 2021 Mr. Schwaneke was the Executive Vice President, Chief Financial Officer and Treasurer of Centene Corporation. Mr. Schwaneke joined Centene Corporation in July 2008 as Senior Vice President, Corporate Controller and Chief Accounting Officer. Prior to joining Centene, Mr. Schwaneke served as the Assistant Controller and then as Chief Accounting Officer of Novelis, Inc. from 2006 through 2008. Mr. Schwaneke received a degree in Accounting from the University of Missouri and is a CPA.

**Defendant CD&R**

81.     Defendant CD&R is a private equity firm headquartered in New York, N.Y.

82.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant CD&R beneficially owned 100,000,000 shares of the Company's common stock, representing 24% of the Company's outstanding common stock. Thus, Defendant CD&R is a controlling shareholder of Agilon. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $5.84, Defendant CD&R owned approximately $584 million worth of Agilon stock as of that date.

83.     The 2024 Proxy Statement stated the following about Defendant CD&R:

Our board of directors is led by our non-executive Chairman, Mr. Ron Williams, who was designated as a nominee for our board of directors (a "CD&R Designee") by CD&R Vector Holdings, L.P. (the "CD&R Investor") pursuant to a stockholders agreement between us and the CD&R Investor (the "CD&R Stockholder Agreement"). The CD&R Stockholder Agreement provides that a CD&R Designee will serve as chair of the board of directors as long as the CD&R Investor holds at least 25% of the outstanding shares of our common stock. In May 2023, the CD&R

24

Investor disposed of certain shares of our common stock in an underwritten offering and its holdings are now less than 25%. Mr. Williams remains our board chairman. Pursuant to the CD&R Stockholder Agreement, CD&R Investor has the right to appoint 20% of the directors on the board of directors given its current share ownership percentage. See "Certain Relationships and Related Party Transactions—CD&R Stockholder Agreement."

The number of members on our board of directors may be fixed by resolution adopted from time to time by the board of directors. Subject to the CD&R Stockholder Agreement, any vacancies or newly created directorships may be filled only by the affirmative vote of a majority of directors then in office, even if less than a quorum, or by a sole remaining director. Each director shall hold office until their successor has been duly elected and qualified, or until their earlier death, resignation or removal.

With respect to any vacancy of a CD&R Designee, the CD&R Investor will have the right to designate a new director for election by a majority of the remaining directors then in office.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

84.     By reason of their positions as officers, directors, and/or fiduciaries of Agilon and because of their ability to control the business and corporate affairs of Agilon, the Individual Defendants owed Agilon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Agilon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Agilon and its shareholders so as to benefit all shareholders equally.

85.     Each director and officer of the Company owes to Agilon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

86.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Agilon, were able to and did, directly and/or indirectly, exercise control

over the wrongful acts complained of herein.

87. To discharge their duties, officers and directors of Agilon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

88. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Agilon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Agilon's Board at all relevant times.

89. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause

the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

90.     To discharge their duties, the officers and directors of Agilon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the directors and/or officers of Agilon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Agilon's own Compliance Code of Conduct ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Agilon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Agilon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Agilon's operations would comply with all applicable laws and Agilon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

91.      Each of the Individual Defendants further owed to Agilon and the shareholders the duty of loyalty requiring that each favor Agilon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

92.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Agilon and were at all times acting within the course and scope of such agency.

93.      Because of their advisory, executive, managerial, directorial, and controlling positions with Agilon, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

28

94.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Agilon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

95.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

96.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

97.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Agilon was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

98.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

99.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Agilon and was at all times acting within the course and scope of such agency.

## AGILON'S CODE OF CONDUCT

100.     Agilon's Code of Conduct sets forth, "[w]e are all accountable for upholding these principles and behaviors in accordance with the highest ethical and legal standards." The Code of Conduct states the following, in relevant part:

> This document applies to all of us. All employees of agilon health are responsible for knowing the Code of Conduct and for abiding by the high legal, ethical, and moral standards it contains. In addition, every employee of agilon health is required to be familiar with and comply with all federal and state laws, rules, and regulations that govern their role within the organization. If you are unfamiliar with any of these standards or rules, it is your obligation to ask. Not knowing the rules or turning a blind eye to activities you are not comfortable with is not acceptable and violates our Code of Conduct.

101.     Regarding "Conflicts of Interest," the Code of Conduct provides, in relevant part:

> Conflict of Interest. A conflict of interest occurs when your personal interests could compromise, or appear to compromise, your judgment, decisions, or actions in the

30

workplace. Conflicts of interest also occur when you, or a member of your family, receive improper personal benefits because of your position in the Company. You should not engage in any activity during your relationship with agilon health that could conflict or appear to conflict with the best interests of the Company. You must avoid actual, potential, or perceived conflicts of interest with agilon health in your professional relationships, including those that may arise in personal relationships due to your position with us.

You have a responsibility to inform the Compliance Department of any transaction or relationship that you feel could result in an actual, potential, or perceived conflict of interest. This information must be provided upon hire, annually during compliance training, and as conflicts arise or the nature of previously disclosed conflicts change.

102.    Regarding the "Retention of Records," the Code of Conduct provides:

Retention of Records. We are committed to keeping complete and accurate records in compliance with sound business practices and applicable laws and regulations. All employees must retain records in accordance with agilon health's Record Retention policy and must seek guidance from the Compliance Office when unsure of if and/or how to retain records.

103.    Regarding "Compliance with All Applicable Laws and Regulations," the Code of

Conduct provides:

You are expected not only to act in compliance with all applicable laws and regulations but also to avoid any behavior that raises the appearance of misconduct. While the legal rules are important to follow, we strive to hold ourselves to higher ethical standards.

In short, we do not and will not allow any form of unlawful or unethical behavior by anyone associated with agilon health. We expect and require you to be law-abiding, honest, trustworthy, and fair in all your business dealings. The Compliance Program has become an integral part of our mission and business operations to meet these expectations.

104.    Regarding "Insider Trading," the Code of Conduct provides, in relevant part:

Understand and follow the laws, rules, and regulations that govern agilon's business, including insider trading laws that prohibit the use of material, non-public information when trading in or recommending Company securities. You may not trade in Company securities based on material, non-public information ("Insider Trading"). Further, if you have material, non-public information, you may not

31

communicate such information to third parties ("Tipping"). These restrictions also apply to securities of other companies if you learn of material, non-public information during your duties for us. In addition to violating Company policy, Insider Trading and Tipping are illegal.

105.    Regarding "Investigations," the Code of Conduct provides, in relevant part:

The Compliance Department maintains and oversees the Compliance Hotline and other methods for reporting potential compliance issues. The staff responsible for supervising these reporting tools will submit all reports or complaints received to the Chief Compliance Officer.

Any reports received relating to our financial statements, accounting, internal controls, or auditing matters will be reported by the Chief Ethics, Compliance & Risk Officer to Internal Audit. No person who is the subject of a complaint will receive such a notification. In conjunction with Internal Audit personnel, the Chief Ethics, Compliance & Risk Officer will undertake an initial investigation on behalf of the Audit Committee to determine if the reported information can be proven. Upon receiving the initial investigation results, the Internal Auditor, in communication with the Audit Committee, will determine if any further action is needed to resolve the complaint.

*       *       *

You must promptly assist and provide accurate information in connection with any investigation conducted by the Compliance Department.

106.    Regarding "Waivers" of the Code of Conduct, the Code of Conduct provides:

Waivers or exceptions to the Code of Conduct will be granted only in advance and under exceptional circumstances. A waiver of the Code of Conduct for any executive officer or director may be made only by the Board of Directors of agilon health or a committee of the Board of Directors. It must be disclosed to shareholders per applicable law and exchange requirements.

107.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

32

Moreover, four of the Individual Defendants violated the Insider Trading section provided in the Code of Conduct by engaging in insider trading during the Relevant Period, netting proceeds of approximately $14,143,022. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

108.   Regarding "Purpose," the Company's Charter of the Audit Committee ("Audit Committee Charter") provides:

> The primary purposes of the Committee are: (a) to assist the Board in overseeing (i) the quality and integrity of the Corporation's financial statements, (ii) the qualifications, independence and performance of the Corporation's independent auditor, (iii) the execution of the Corporation's internal audit function, (iv) the accounting, financial and external reporting policies and practices of the Corporation, and (v) the Corporation's compliance with legal and regulatory requirements as such requirements pertain to the accounting, financial and external reporting policies and practices of the Corporation ; and (b) to prepare the report of the Committee required to be included in the Corporation's annual proxy statement under the rules of the U.S. Securities and Exchange Commission (the "SEC").

> The Committee's responsibility is one of oversight. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Corporation's financial statements are complete and accurate, or are in accordance with generally accepted accounting principles ("GAAP"). The primary responsibility to plan and conduct audits is that of the Corporation's independent auditor. Each member of the Committee shall be entitled to rely, to the maximum extent permitted under applicable law, on (a) the integrity of those persons and organizations within and outside the Corporation from which it receives information and (b) the accuracy of the financial and other information provided to the Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board).

109.   The Audit Committee Charter also describes the Audit Committee's duties and

responsibilities. Regarding "Reports" to the Board, the Audit Committee Charter provides in relevant part:

### Reports to Board; Review of Committee Performance and Charter

(a)     The Committee shall report regularly to the Board and review with the Board any issues that arise with respect to:

(i)     the quality or integrity of the Corporation's financial statements;

(ii)     the performance and independence of the Corporation's independent auditor;

(iii)     the execution of the Corporation's internal audit function; and

(iv)     the Corporation's compliance with legal and regulatory requirements as such requirements pertain to the accounting, financial and external reporting policies and practices of the Corporation.

110.     Regarding "Review," of reports to the Board, the Audit Committee Charter provides, in relevant part:

(a)     The Committee shall undertake and review with the Board an annual performance evaluation of the Committee, which shall compare the performance of the Committee with the requirements of this Charter and set forth the goals and objectives of the Committee for the upcoming year. The performance evaluation by the Committee shall be conducted in such manner as the Committee deems appropriate. The report to the Board may take the form of an oral report by the chairperson of the Committee or any other member of the Committee designated by the Committee to make this report.

(b)     The Committee shall review and re-assess annually the adequacy of this Charter and recommend any proposed changes to the Board for approval. The Corporation's Relationship with the Independent Auditor

(c)     The Committee shall possess sole responsibility for the appointment or replacement (subject, if applicable, to shareholder ratification) retention, termination, compensation, evaluation and oversight of the work of each independent auditor engaged by the Corporation for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Corporation, and each such independent auditor shall report directly to the Committee. The Committee shall be responsible for resolving disagreements between management and each such independent auditor regarding financial

34

reporting. The Committee shall have the responsibility and authority to approve, in advance of the provision thereof, all audit services and, subject to the de minimis exception of Section 10A(i) of the Exchange Act and the SEC rules promulgated thereunder, all permitted non-audit services to be provided to the Corporation by any such independent auditor. The Committee may delegate to one or more designated members of the Committee the authority to grant preapprovals of audit and non-audit services pursuant to Section 10A(i)(3) of the Exchange Act and any related rules promulgated thereunder by the SEC, which pre-approvals shall be presented to the full Committee at the next scheduled meeting.

(d)      The Committee shall have the sole authority to approve any compensation payable by the Corporation for any approved audit or non-audit services to any such independent auditor, including the fees, terms and conditions for the performance of such services.

111.    Regarding annual review, the Audit Committee Charter states, in relevant part:

(a)      The Committee shall, at least annually:

(i)      obtain and review a report by the independent auditor describing, to the extent permitted under applicable auditing standards:

(2)      the independent auditor's internal quality-control procedures;

*      *      *

(ii)    review the foregoing report and the independent auditor's work throughout the year and evaluate the independent auditor's qualifications, performance, independence and quality control procedures, including a review and evaluation of the lead partner on the independent auditor's engagement with the Corporation and present its conclusions. The results of this review should be presented to the Board and, if so determined by the Committee, the Committee will recommend that the Board take additional action to satisfy itself of the qualifications, performance and independence of the independent auditor.

*      *      *

(h)      The Committee shall establish, and periodically review, policies for the Corporation's hiring of employees or former employees of the independent auditor.

(i)      The Committee shall review, and discuss as appropriate with management, the internal auditors and the independent auditor, the report of the independent auditor required by Section 10A(k) of the Exchange Act.

(j)      The Committee shall review and evaluate the lead partner of the

independent audit team and ensure proper rotation of audit partner, lead partner and concurring partner. In addition, the Committee shall consider whether it is appropriate to adopt a policy of rotating the independent auditing firm.

112.    Regarding "Reports to Board," the Audit Committee Charter provides, in relevant part:

***Financial Reporting and Disclosure Matters***

(k)    The Committee shall meet to review and discuss the Corporation's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's reviews of the quarterly financial statements, including any difficulties encountered or significant disagreements with management and management's responses to such matters.

*        *        *

(iii)    analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

*        *        *

(vii)    management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act, as amended, and Item 308 of Regulation S-K.

113.    Regarding the filing of documents with the SEC, the Audit Committee Charter states, in relevant part:

(m)    The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Corporation's Annual Report on Form 10-K.

(n)    The Committee shall prepare, review and approve the report of the Committee required by the SEC to be included in the Corporation's annual proxy statement.

(o)    The Committee shall review and discuss with management the Corporation's practices regarding earnings press releases and the provision of

financial information and earnings guidance by management to analysts and ratings agencies.

(p)     The Committee shall periodically review and discuss with management the Corporation's guidelines and policies with respect to the process by which the Corporation undertakes risk assessment and risk management, including discussion of the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Corporation or any of its subsidiaries and any regulatory or governmental authorities, and matters that could materially impact the Corporation's internal control over financial reporting.

(q)     The Committee shall review and discuss with the CEO and CFO the procedures undertaken in connection with the CEO and CFO certifications for the Corporation's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, including their evaluation of the Corporation's disclosure controls and procedures and internal controls.

(r)     The Committee shall annually obtain from the independent auditor assurance that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

(s)     The Committee shall review and approval of all "related party transactions" as required to be disclosed under Item 404 of Regulation S-K. Internal Audit, Compliance Matters and Other

*          *          *

114.    Regarding "Structure and Procedures," the Audit Committee Charter states the following, in relevant part:

The affirmative vote of a majority of the members of the Committee participating in any meeting of the Committee is necessary for the adoption of any resolution.

The Committee shall meet at least once every fiscal quarter, at such times and places as shall be determined by the Committee chairperson, and may have such additional meetings as the Committee chairperson or a majority of the Committee's members deem necessary or desirable. The Committee may request (a) any officer or employee of the Corporation, (b) the Corporation's outside counsel or (c) the Corporation's independent auditor to attend any meeting (or portions thereof) of the Committee, or to meet with any members of or consultants to the Committee, and to provide such information as the Committee deems necessary or desirable.

The Committee shall meet in separate sessions, at least once every fiscal quarter, with management, with the Corporation's internal auditors (or other personnel responsible for the Corporation's internal audit function) and with the independent auditor, and have such other direct and independent interaction with such persons from time to time as the members of the Committee deem appropriate.

The meetings and other actions of the Committee shall be governed by the provisions of the By-laws applicable to meetings and actions of the Committees of the Board. Members of the Committee may participate in a meeting of the Committee by means of conference call or similar communications arrangements by means of which all persons participating in the meeting can hear each other.

115.     Regarding "Authority and Resources," the Audit Committee Charter states the following, in relevant part:

The Committee may, without further approval by the Board, obtain such advice and assistance, including, without limitation, the performance of special audits, reviews and other procedures, from outside accounting, legal or other advisors as the Committee determines to be necessary or advisable in connection with the discharge of its duties and responsibilities hereunder. Any accounting, legal or other advisor retained by the Committee may, but need not, be in the case of an outside accountant, the same accounting firm employed by the Corporation for the purpose of rendering or issuing an audit report on the Corporation's annual financial statements, or in the case of an outside legal or other advisor, otherwise engaged by the Corporation for any other purpose.

The Corporation shall pay to any independent auditor employed by the Corporation for the purpose of rendering or issuing an audit report or performing other audit, review or attest services and to any outside accounting, legal or other advisor retained by the Committee pursuant to the preceding paragraph such compensation, including, without limitation, usual and customary expenses and charges, as shall be determined by the Committee. The Corporation shall pay ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties, as shall be determined by the Committee.

116.     In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee during the Relevant Period failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's

internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

117.    In July 2016, Agilon was formed by private equity firm Clayton, Dubilier & Rice by the completion of two healthcare acquisitions, which then merged: Primary Provider Management Company, Inc., which was headquartered in California, and Cyber-Pro Systems, Inc., which was headquartered in Hawaii. Thereafter, the California Department of Managed Health Care found the Company to have engaged in noncompliance regarding utilization management. In February 2021, Agilon ceased its California operations. In April 2021, Agilon began a physician partnership with a physician-owned medical group based in Ohio. Following that period, the Company has expanded into new partnerships throughout the United States where the Company operates healthcare networks of primary care physicians ("PCPs").

118.    Agilon is a Delaware-incorporated health care and technology company based in Austin, Texas that purportedly acts as the intermediary between physician groups. These physician groups provide medical services to senior citizens and Medicare insurers. Agilon takes payments from these insurers and provides fixed payments to physician groups regardless of the services provided to the patients. Agilon maximizes profit by keeping the costs incurred by each patient below what Agilon receives from the government and insurers.

119.    The Company and its physician groups share in any profits derived from unspent capitation payments. Although the Company splits profits with its physician partners, Agilon accepts the full financial risk for patients attributed to Agilon through its contracted PCPs and is financially liable for all healthcare services required by those patients. As a result, Agilon

39

effectively acts as a middleman between payors and healthcare providers, with payors able to retain a portion of premium payments. Premium payments include those received from the Centers for Medicare & Medicaid Services.

120.    As part of its business model, Agilon estimates and sets reserves to account for medical costs incurred that have not been reported or submitted for payment. Because of the transfer of financial risk to Agilon, investors find it important that the Company tracks and reports utilization rates. If the total cost to provide medical services to the Company's members exceeds the amount of revenue received by Agilon for those members, the Company will suffer negative cash flows. Thus, the Company uses Medical Margin to describe the amount earned from medical services revenue after medical service expenses are deducted. Agilon expects that as the Company's platform matures over time, the Medical Margin will "increase in absolute dollars." As Agilon has acknowledged, the Company's "profitability depends to a significant degree on [its] ability to accurately predict and effectively manage [its] medical margin, through improving healthcare quality and effectively managing costs."

121.    Another part of Agilon's business model is the "Total Care Model," which focuses on Medicare partnerships with community-based physician groups. This model involves arrangements with health plans or with the government, like a subscription, per member per month ("PMPM"). Agilon purported that its Total Care Model would allow the Company to grow membership and profitability over time.

122.    Agilon filed the IPO Registration Statement with the SEC on March 18, 2021. The IPO Registration Statement was then declared effective by the SEC on April 14, 2021.

123.    Pursuant to the IPO Registration Statement, on or around April 14, 2021, Agilon's

common stock began publicly trading on the NYSE. Agilon's common stock trades under the ticker symbol "AGL."

124.    On April 16, 2021, the Company filed the IPO Prospectus with the SEC in connection with the IPO on April 16, 2021. The IPO Prospectus incorporated and formed part of the IPO Registration Statement.

125.    Pursuant to the IPO Documents, the Company, along with other selling stockholders identified in the Prospectus, sold approximately 53 million shares of Agilon common stock to the public at an offering price of $23.00 per share. According to the IPO Documents, the total proceeds amounted to approximately $1.01 billion to the selling stockholders after applicable underwriting discounts and commissions.

126.    From Agilon's creation to the IPO, the Company stated that it had exported its Total Care Model from 1 to 17 geographies and grown its patient base from approximately 24,000 patients to 210,000 Medicare Advantage members on the Agilon platform. Simultaneously, Agilon purported that its Medical Margins had dramatically improved for its physician groups as those physician groups matured on Agilon's network and platform. In particular, the Company stated that the compound annual growth rate ("CAGR") for its membership in one geography was 20%, while its Medical Margin PMPM CAGR for that same geography was 169% over the same three-year period, indicating substantially improved profitability.

127.    As for the Medical Margin projections, Agilon boasted in its IPO prospectus that, "[w]e believe medical margin rates within any geography will continue to increase over the course of our long-term partnerships, as cohorts of members within the geography are on our platform for longer periods of time."

41

128.     Following the IPO, the Company claimed to have achieved remarkable Medical Margin and revenue growth. The Company purported to confirm the distinct advantages of the Company's care- focused business model. For Fiscal Year 2022, the Company stated it had achieved total revenue of $2.71 billion. This reflected a 48% increase compared to $1.83 billion achieved in Fiscal Year 2021. Agilon also claimed its Medical Margins had grown even more during the year. Agilon represented that the growth was improving to $305 million for 2022. This reflected a 67% increase over the $182 million medical margin achieved in 2021. Additionally, Agilon stated its net losses for the year had fallen to $107 million, compared to a net loss of $407 million in 2021. Also, the Company's adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") had swung from negative $39 million in 2021 to positive $4 million in 2022.

129.   Agilon filed the September 2021 SPO with the SEC and it was declared effective on September 9, 2021.

130.     On September 13, 2021, the Company filed the September 2021 Prospectus with the SEC on Form 424B4 in connection with the September 2021 SPO. The September 2021 Prospectus incorporated and formed part of the September 2021 Registration Statement. The September 2021 Registration Statement was signed by Defendants Sell and Bensley.

131.     The Company announced the pricing of the September 2021 SPO and represented to investors that it would sell 17 million shares of Agilon common stock at a price of $24.15 per share. Additionally, Agilon disclosed a 30-day option that the Company would grant for underwriters to purchase up to 10,500,000 additional shares of Company common stock.

132.     Again, on May 15, 2023, Agilon filed documents with the SEC in connection with

May 2023 SPO.

133.    On May 17, 2023, the Company filed the May 2023 Prospectus on Form 424B4 with the SEC in connection with the May 2023 SPO. The prospectus incorporated and formed part of the May 2023 Registration Statement. The May 2023 Registration Statement was signed by Defendants Sell and Bensley.

134.    The Company announced the pricing of the May 2023 SPO, and represented to investors that it would sell 70 million shares of Agilon common stock.

**Materially False and Misleading Statements**

***The IPO Documents***

135.    On March 18, 2021, the Company filed the IPO Registration Statement with the SEC which was declared effective on April 14, 2021. The IPO Documents contained false and misleading statements and failed to make adequate disclosures required under the rules and regulations governing the preparation of the IPO Documents. Defendants Sell and Bensley reviewed and signed the IPO Documents.

136.    In the Company's IPO Prospectus, Agilon bolstered that its Medical Margins had dramatically improved for its physician groups as those physician groups matured on the Company's network and platform. The Company stated the following, in relevant part:

> We believe Medical Margin rates within any geography will continue to increase over the course of our long-term partnerships, as cohorts of members within the geography are on our platform for longer periods of time. With 70% of our members on our platform for fewer than three years, we believe that we are well-positioned to benefit from significant embedded margin growth from our long-term economic model by improving healthcare outcomes and effectively managing costs.

137.    The IPO Registration Statement specifically claimed that the Company's unique

business model was "transforming healthcare by empowering [PCPs] to be the agents for change in the communities they serve." The IPO Registration Statement claimed that PCPs were "best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model." In relevant part, the IPO Registration Statement stated as follows:

> Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, *we are poised to revolutionize healthcare* for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming risk-bearing entities (each, an "RBE") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from *successfully improving quality of care and reducing costs*.

(Emphasis added).

138. The IPO Registration Statement also represented that the Company's "business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network." The IPO Registration Statement touted that Agilon's platform provided strong data integration which "improve[d] quality of care, cost and patient and physician experience" and "reduce[d] medically unnecessary drivers of healthcare costs." The IPO Registration Statement went on to provide that, "[a]s earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings

with our anchor physician groups." This sharing purportedly created a "Flywheel Effect," which "generates improving quality and cost outcomes."

139.    The IPO Registration Statement proclaimed that the Company was "well positioned to benefit from significant embedded margin growth from [Agilon's] long-term economic model by improving healthcare outcomes and effectively managing costs." Also, the IPO Registration Statement represented that the Company's "long-term partnership with [its] anchor physician groups creates the potential for cost-efficient organic growth over time in the number of members on [its] platform as existing patients of [its] PCPs age into Medicare and as existing Medicare-eligible patients choose to convert from FFS to MA."

140.    The aforementioned statements referenced in ¶¶ 136-139 were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the Company's business model was unable to provide the cost savings and the mitigation of medical expenses that it purported to, (ii) the Company's purported historical cost savings portrayed to investors, in connection with the IPO, were the short-term effects of the COVID-19 pandemic and were not representative of the cost controls and incentives inherent in the Company's business model; and (iii) as a result, the Company suffered from a material risk of higher utilization and medical claims rates once the short-term effects of the COVID-19 pandemic subsided and providers  in the Company's network were positioned to experience an upsurge in patient demand for medical services materially above the historical rate represented in the IPO Registration Statement.

141.    Additionally, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had

or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

142.    The failure of the IPO Registration Statement to disclose the truth of the Company's business model and the adverse utilization and cost trends plaguing Agilon, as well as the related impact to the Company's Medical Margin, adjusted EBITDA, ability to generate positive cash flows, and overall business and profitability, violated Item 303 because these undisclosed facts were known to Defendants and had (and would continue to have) an unfavorable impact on Agilon's sales, revenues, and income from continuing operations.

143.    Likewise, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

144.    This failure to disclose the truth also violated Item 105. The adverse facts created substantial risks that were hidden from the investing public even though these facts were some of the most significant factors that made an investment in the Company's securities risky. Indeed, the boilerplate discussions of possible risks provided in the IPO Registration Statement were themselves materially misleading. The IPO Registration Statement failed to disclose that the Company had already been negatively impacted by undisclosed adverse costs and rising medical expenses, which had materially adversely affected the Company's financial results and business prospects.

### The May 2021 Earnings Release

145.    On May 26, 2021, the Company issued a release disclosing its first quarter earnings

for the 2021 Fiscal Year. The release represented that the Company had achieved a $52 million Medical Margin and $4 million adjusted EBITDA for the first quarter. The press release further revealed that the Company had sustained a $14 million net loss for the first quarter.

### May 2021 10-Q

146.    On that same day, Agilon filed with the SEC its first quarter 2021 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the first quarter 2021 quarterly release. Also, the Form 10-Q stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

### The May 2021 Earnings Call

147.    On May 27, 2021, the Company held a conference call to discuss its first quarter 2021 financial results. The call was hosted by Defendants Sell and Bensley.  During the call, Defendant Sell stated "with our approach, all stakeholders are winning." He continued, "payers experience consistent growth and gross margins while enjoying higher patient quality scores and retention, and Medicare and local communities benefit through more sustainable primary care and effective management of health care costs."

### The August 2021 Earnings Release

148.    On August 4, 2021, the Company issued a release announcing its financial results for the second quarter ending June 30, 2021. The release stated that the Company had achieved a $55 million Medical Margin and ($2 million) adjusted EBITDA for the quarter. The release further

stated that the Company had sustained a $299 million net loss for the quarter, which purportedly reflected one-time increased costs from the IPO.

### August 2021 10-Q

149.    On that same day, the Company filed with the SEC its second quarter 2021 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the second quarter 2021 release. Also, the Form 10-Q stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

### The August 2021 Earnings Call

150.    On August 5, 2021, the Company hosted a conference call to discuss its second quarter 2021 financial results. The call was hosted by Defendants Sell and Bensley. In response to an analyst question, Defendant Sell stated, "I think we're pleased by where we're at for medical margin . . . [O]bviously new members always will come in at lower medical margins than more mature cohorts over time."

### The September 2021 Offering Documents

151.    On September 13, 2021, the Company filed with the SEC the September 2021 Prospectus for the September 2021 SPO. Defendants Sell and Bensley reviewed and signed the September 2021 SPO Documents. The September 2021 Registration Statement substantially contained the same representations as those contained in the Company's IPO Registration Statement. The materially false and misleading representations are detailed in ¶¶ 136-144 above.

### The October 2021 Earnings Release

48

152.     On October 28, 2021, the Company issued a release announcing results for its third quarter ending September 30, 2021. The release stated that the Company had achieved a $43 million Medical Margin and ($14 million) adjusted EBITDA for the quarter, while sustaining a $36 million net loss.

### The October 2021 10-Q

153.     On that same day, the Company filed with the SEC its third quarter 2021 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the third quarter 2021 release. Also, the Form 10-Q stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

### The October 2021 Earnings Call

154.     On October 29, 2021, the Company held a conference call to discuss its third quarter 2021 financial results. The call was hosted by Defendants Sell and Bensley. In his remarks, Defendant Sell stated, in pertinent part:

> We were again pleased with our performance, both in terms of growth and medical margin. Our results were especially encouraging given broader dynamics around medical costs and the Delta variant.

> *       *       *

> Through the agilon platform, we leverage algorithms to better identify specific cohorts of patients or physicians, stratify where care should optimally be delivered within that network and deploy the clinical support alongside our partners to drive sustainably lower cost and improved quality.

155.     In response to an analyst question, Defendant Sell stated "and so most of the better-than-expected performance is based on lower medical costs."

### The March 2022 Earnings Release

156.    On March 3, 2022, the Company announced its fourth quarter and full year financial results for Fiscal Year 2021. The release stated that for Fiscal Year 2021, the Company had achieved a $182 million Medical Margin and ($39 million) adjusted EBITDA, while sustaining a $407 million net loss for the year. The release quoted Defendant Sell, who stated, "looking ahead to 2022, we expect to generate significant gains  in profitability while maintaining strong growth in membership and revenue."

### The 2021 10-K

157.    On that same day, the Company filed its Form 10-K for the Fiscal Year 2021 with the SEC (the "2021 10-K"), which was signed by Defendants Sell, Bensley, Sobotka, Williams, Sachdev, Gourdine, Mansukani, Richards, Schnall, Smith, Strum, Wulf, and McLoughlin. The Company represented, *inter alia*, that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

158.    Appended as an exhibit to the 2021 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were signed by Defendants Sell and Bensley and certified that "[t]he [2021 10-K] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

### The March 2022 Earnings Call

159.    On March 4, 2022, the Company held a conference call to discuss its financial results for the fourth quarter and Fiscal Year 2021. The call was hosted by Defendants Sell and Bensley. During the call, Defendant Sell stated, in pertinent part:

> We have been able to deliver higher levels of membership growth while still generating significant gains in profitability.  And we expect to generate positive

adjusted EBITDA in 2022. Because of our focus on existing market capacity, local market scale and platform insights, we are transforming how health care is delivered across our markets, both in and outside of the primary care office, with increased primary care touch points and impactful programs like specialty referral and palliative care. We believe all primary care physicians will need to change their business model over the next decade, shifting from a transaction, fee-for-service model to a value-based subscription model. Ultimately, this will improve quality, lower costs and create better outcomes for our health care system.

### The May 2022 Earnings Release

160.    On May 5, 2022, the Company issued a press release announcing its financial results for the first quarter ending March 31, 2022. The release stated that the Company had achieved an $86 million Medical Margin and $12 million adjusted EBITDA for the first quarter, while achieving $1 million in net income.

161.    During his prepared remarks, Defendant Sell stated: "The new primary care model we have created with our partners aligns physician outcomes with improvements in the quality, experience and cost of their senior patients care." Defendant Sell also stated, "Being first in a market, coupled with scale, allows agilon and our partners to shape the local evolution of value-based care and positively impact downstream specialty and facility costs."

### The May 2022 10-Q

162.    On that same day, the Company filed with the SEC its first quarter 2022 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the first quarter 2022 release. Also, the Form 10-Q stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

### The August 2022 Earnings Release

163.    On August 4, 2022, the Company issued a release announcing its financial results for the second quarter of the 2022 Fiscal Year. The release stated that the Company had achieved an $82 million Medical Margin and $7 million adjusted EBITDA for the quarter, while sustaining a $21 million net loss.

164.    In his remarks, Defendant Sell represented that "the new primary care model we have created with our partners aligns physician outcomes with improvements in the quality, experience and cost of their senior patients total care." Defendant Bensley added that "growth in our platform support cost continues to trend well below our revenue growth and highlights the light overhead structure of our partnership model."

### *August 2022 10-Q*

165.    On that same day, the Company filed with the SEC its second quarter 2022 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the second quarter 2022 release. Also, the Form 10-Q stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

### *The November 2022 Earnings Release*

166.    On November 3, 2022, the Company issued a release announcing its financial results for the third quarter of the 2022 Fiscal Year. The release stated that Agilon had achieved a $76 million Medical Margin and ($5 million) adjusted EBITDA for the quarter, while sustaining a $31 million net loss.

167.    In his remarks regarding Agilon's direct contracting program, Defendant Bensley

stated: "We continue to outperform national benchmarks from a cost and quality standpoint." In response to an analyst question, Defendant Sell stated: "I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of the benefits of the high-touch model, and it's coming through in terms of better satisfaction, better health outcomes and ultimately lower costs and better margins overall."

168.   Also during this call, Defendant Sell went on to emphasize that Agilon's "membership, revenue and medical margins were above the high end of our guidance ranges." Defendant Sell indicated that "[t]his year, we are driving substantial growth in medical margin PMPM." Defendant Bensley input that "[f]or the full year 2022, we have raised our membership, revenue and medical margin outlook to reflect the strong performance in our business." Defendant Sell also added that Agilon was "beating national benchmarks in terms of utilization trend."

### November 2022 10-Q

169.   On that same day, the Company filed with the SEC its third quarter 2022 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the third quarter 2022 release. Also, the Form 10-Q stated that, as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

### The January 2023 Conference

170.   On January 9, 2023, the Company, hosted by Defendant Sell, held an investor presentation at the JPMorgan Healthcare Conference. Defendant Sell touted "the power of [the Company's] business model" and represented that it would positively impact Agilon's margins.

Moreover, Defendant Sell, when discussing the Company's "incredible growth" and ability to deliver from a margin perspective, boasted that, "[i]n 2022, we stepped up both medical margin and adjusted EBITDA substantially." As a result, Defendant Sell represented that, "today, we are providing 2023 adjusted EBITDA guidance of $75 million to $90 million, another meaningful step up in profitability." Defendant Sell described this adjustment as "another meaningful step up in profitability." Defendant Sell also claimed that this increase in profitability would derive from the maturation of the Company's patient cohorts and increased platform efficiencies, stating in pertinent part as follows:

> To understand this phenomenon how an annual EBITDA ramp of plus $40 million in '22, plus $70 million to $80 million in 2023 gets created, you need to get underneath the composite view and understand how members mature across time. This cohort migration of members across time is one of the true powers in the financial model of agilon. Our ability to create long-term member subscription economics that appreciate over time is super important for our physicians, for the communities, and it gets that flywheel turning faster and faster.

*     *     *

> Finally, there's platform support leverage. We have an incredibly capital efficient model. We've been able to reduce platform support costs in '22 from 7% to 5%, and in 2023, you will see another significant improvement.

### *The March 2023 Earnings Release*

171.   On March 1, 2023, Agilon announced its fourth quarter and full year financial results for Fiscal Year 2022.  The Company boasted of its Medical Margin as it related to revenue, noting that "[m]edical margin represented 8.8% of revenue during the fourth quarter and 11.2% for the fiscal year 2022, compared to 6.8% and 9.9% of revenue in the fourth quarter and full year 2021, respectively." The release stated that in Fiscal Year 2022 the Company had achieved a $305 million Medical Margin and $4 million adjusted EBITDA, while sustaining a $107 million net loss

for the year. This was compared to a $407 million net loss in 2021. The release further stated that "guidance for 2023 includes significant gains in Adjusted EBITDA to $75 million to $90 million while maintaining strong revenue and membership growth." Additionally, the release stated that Agilon was on track to achieve a $160 million to $170 million Medical Margin and $32 million to $37 million adjusted EBITDA in the first quarter of 2023, and a $535 million to $560 million Medical Margin and $75 million to $90 million adjusted EBITDA for Fiscal Year 2023.

172.    During his prepared remarks, Defendant Sell represented that the Company was on track to achieve nearly $550 million in Medical Margin for 2023 because of Agilon's healthcare model, which purportedly reduced wasteful spending, stating in pertinent part as follows:

> Our accelerating momentum in both new and current markets comes from our ability to drive meaningful reductions in wasteful health spending, generating a surplus that we call medical margin and reinvest roughly half of that surplus back into local primary care. Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally.

173.    Defendant Sell also claimed that the maturation of Agilon's member cohorts and increased operational leverage was driving sustained earnings growth, stating, in pertinent part, as follows:

> Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all ***projected to grow even faster than they did last year.***

> Our adjusted EBITDA guidance of $75 million to $90 million reflects a year-over-year increase of approximately $78 million at the midpoint, where we are sustaining 50% MA membership growth. Just like in 2022, the inflection in our 2023 adjusted EBITDA is powered by our year 2-plus markets, which generate substantial operating leverage at the market and corporate level.

> This step-change in earnings is being delivered while 44% of our membership is in year 1 or 2 markets versus 37% in 2022, highlighting the long- term embedded earnings being created. But we continue to drive significant improvements in the

current period.

These results also highlight the operating leverage inherent in setting up the infrastructure for full risk in a local market as the flow-through of incremental medical margin dollars to adjusted EBITDA is significant.

***The takeaway is that the maturation of our markets and members is accelerating our adjusted EBITDA gains in 2023 and beyond.***

(Emphasis added).

### *The 2022 10-K*

174.    On March 1, 2023, Agilon filed with the SEC its Form 10-K reporting Agilon's financial and operational results for 2022 (the "2022 10-K"), which was signed by Defendants Sell, Bensley, Kasenchak, Williams, Sachdev, Mansukani, Richards, Schnall, Schwaneke, Strum, Wulf, and McLoughlin. The 2022 10-K included the following risk factors:

We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability . . . These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business.

\*       \*       \*

[F]actors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following . . . The utilization rates of healthcare services, including inpatient hospitalization, by our members.

\*       \*       \*

Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.

\*       \*       \*

[O]ur actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period.

\*     \*     \*

Our estimates of [medical services that have been incurred but not reported] liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate [medical services that have been incurred but not reported] levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

175.    Appended as an exhibit to the 2022 10-K were signed certifications pursuant to SOX, which were signed by Defendants Sell and Bensley and certified that "[t]he [2022 10-K] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

### The March 2023 Conference

176.    On March 8, 2023, Defendant Bensley, on behalf of Agilon, presented to investors at the Cowen Health Care Conference. In response to an analyst, who asked Defendant Bensley to explain the "really significant pivot towards profitability" that the Company was claiming it was experiencing, Defendant Bensley answered, in pertinent, part as follows:

[A]s we go into 2023 we guided the numbers at the midpoint of our guidance of $75 million to $90 million of adjusted EBITDA, *it's like another $80 million pickup.  So yes, we're definitely reflecting on that side.*

The drivers of it are that – really the things that have driven our performance over the last few years continue to drive – in fact*, if anything we're driving it a little bit outside performance versus what we expected. We continue to do tremendously well on that budget*. So a big part of our movement year-over-year has been our ability to bring margin and membership . . . .

\*     \*     \*

The second thing is, I mean, we have done and we continue to do a really good job of – as those markets come on and as we secure them on the platform, being able to generate better overall quality of health care for our members, better overall

57

health outcomes for our members and also just eliminating a lot of waste in the system in terms of driving cost out of the system.

***And that has resulted in a really nice maturation cohorts*** for each of these markets as they kind of go on the platform for 1-year, 2-year, 3-year, 4-year (inaudible) on with the market sort of PMPM on the platform for over 5 years. And really pleased what we saw in 2022, we just reported that at the end of the year, those markets that were on the platform for 2 years plus are kind of excluding the year 1 markets, had like a 33% increase in Medical Margin PMPM basis, where we're already have like $124.

***But*** each year, you can see the membership growth versus that medical margin growth, it comes just through in the numbers. So if we had about a 45% increase in membership in 2022, our medical margin dollars have increased . . . 57%. ***So you're just seeing that member maturation flow through with medical margin continuing to grow at a faster rate than membership . . . type of numbers which are on the platform***.

\*       \*       \*

***And as we look forward to what we've guided for 2023 to get to the $80 million, you'll see that factor again***. So we've guided to about a 50% increase in ***membership***, but about an 8% increase in medical margin dollars. So that's the same phenomena of those markets maturing on the platform and getting that positive growth with medical margin.

(Emphasis added).

177.    Also during the conference, Defendant Bensley stated that, based on "all the things that we've seen over the last year" the Company had "really, really high confidence in our trajectory against our long-term objectives." This included "around 800,000 members in 2026 and medical margin numbers on a PMPM basis in the mid-160s, platform support costs at or below 3% and EBITDA dollars up around that $600 million range."

***The March 2023 Investor Day***

178.    On March 30, 2023, Defendants Sell and Bensley hosted Agilon's annual Investor Day. During his remarks, Defendant Sell touted that Agilon was on track to achieve $550 million

in Medical Margin for 2023, describing this as a "big number." He continued, "It's up $250 million

from 2022. This number is incredibly important in terms of driving the step-up in adjusted

EBITDA. This year, it's north of $80 million of improvement from 2022 to 2023."

179.    During the Investor Day, Defendant Bensley also focused on Agilon's purported

improved profitability, stating the following, in relevant part:

> ***Adjusted EBITDA at agilon is inflecting in a positive way. That's driven by a – that's a function of our accelerating growth, our improving unit economics, our*** maturing membership base as well as our continuing operating leverage. All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability***. And we're doing this in a capital-light, high-returns model. We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond.***

> \*     \*     \*

> So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million. That's really a function of the acceleration in member and revenue growth that we've seen since our first market went live in 2018 with a revenue CAGR of 50% over that time period. That's going to inflect up then to over $4 billion of revenue in 2023. And when you consider all the members that we have live on the platform today, as well as all the members that we're implementing in this large class of 2024 that Veeral just talked about, we have clear line of sight to agilon as a $5.5 billion revenue company today.

> Medical margins growing at even a faster rate with a 60% CAGR over that same time period. And ***we expect medical margin dollars to inflect up to about $550 million in 2023. That's an 80% year-over-year increase from what we just reported for 2022. And I think that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership.***

(Emphasis added).

180.    Defendant Bensley continued by claiming that the Company's Medical Margin had

grown "significant[ly], double digit or more in every single one of these member cohorts . . .

[T]hey're all progressing consistently. And we're expecting a pretty significant and positive

inflection in 2023." Defendant Bensley also stated that he had "great visibility in what the drivers

of that inflection is," and Defendant Bensley boasted the "positive cash flow in 2024 and beyond."

Also, Defendant Bensley stated in pertinent part:

> Adjusted EBITDA is inflecting more members coming on to the market earlier, continued medical margin progression in a positive direction, great operating leverage, all of that gives us high confidence in our 2026 outlook of 850,000 MA members live on the platform, flowing through to over $600 million of adjusted EBITDA.

181.    In response to an analyst question, Defendant Bensley stated that the Company was

"much more confident now in our ability to drive medical margin improvement through claims,

control through all of these clinical initiatives we put out there." He further stated that Agilon had

"a lot of confidence in the upside case" of its long-term guidance because of its "really clear line

of sight" which gave the Company "a lot of confidence" in reaching its 2026 adjusted EBITDA

outlook of more than $600 million.

### The May 2023 Earnings Release

182.    On May 9, 2023, the Company announced its first quarter financial results for the

quarter ending March 31, 2023. The release stated that the Company had revised its estimations of

adjusted EBITDA to include geography entry costs to accord with recent SEC guidance. Under

the new calculations, the release claimed that for the first quarter, the Company had achieved a

$162 million Medical Margin and $24 million adjusted EBITDA, while sustaining a $16 million

net loss for the quarter. The release also represented that "[c]ontinued gains in profitability driven

by strong performance across partner markets, inclusive of higher membership growth," had

bolstered Agilon's results.  The release further stated that Agilon was now on track to achieve a

$138 million to $148 million Medical Margin and $2 million to $10 million adjusted EBITDA in

the second quarter of 2023. For Fiscal Year 2023, Defendant Bensley explained that "[w]e

anticipate medical margin in a range of $535 million to $560 million and adjusted EBITDA in the range of negative $3 million to positive $25 million."

183.    During his remarks, Defendant Sell stated that the Company's "profitability continues to inflect higher, with first quarter medical margin up 88% to $162 million and adjusted EBITDA more than tripling to $24 million." Defendant Sell further stated, "With our strong start to the year, we are maintaining the full year adjusted EBITDA outlook we provided in March," which had been recalculated to factor in geographic entry costs.

184.    Defendant Bensley similarly touted Agilon's Medical Margin results, which he represented had significantly improved despite a hit from prior year revenue and claims adjustments, stating the following, in relevant part:

> ***Medical margin increased 88% year-over-year to $162 million during the first quarter***. Medical margin increased both as a percentage of revenue and on a PMPM basis, even while accounting for the dilution of our membership growth. Membership margin was 14.3% of revenue during the first quarter compared to 13.2% last year, and medical margin PMPM increased 17% to $135 compared to $116 last year.
>
> ***Medical margin benefited from the maturation of older markets and member cohorts which continue to offset dilution from our year 1 numbers***. Medical margins for our year 2 plus partners, which excludes the dilution from year 1 markets, increased 72% during the first quarter on a dollar basis and by 47% on a PMPM basis. As we've discussed with you in the past, medical margin growth in our year 2 plus partners drives the majority of our adjusted EBITDA gains.

(Emphasis added).

185.    Defendant Sell, when asked by an analyst to discuss the cost trends Agilon was seeing, stated that "utilization was very much in line with what we would expect." Defendant Bensley similarly misrepresented the quarter's "true-ups" as limited to a small number of old high-cost claims and "retro" members added to the network, which were all "within a manageable

range" and did not signify any broader cost or utilization issues. Defendant Bensley further claimed that as Agilon "move[s] through this year and we get more and more visibility to pay claims with our new payer partners and our new markets, by the time we get to Q4, you'll see that number moderate back down again as it has in the previous couple of years."

### The May 2023 10-Q

186.    On that same day, the Company filed with the SEC its first quarter 2023 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the first quarter 2023 release. Also, the Form 10-Q stated that, as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars." Additionally, Agilon claimed its costs incurred for medical services provided to patients was approximately $733.5 million. Agilon also purported in the Form 10-Q that there had been "no material changes to the risk factors disclosed in the [2022 10-K]."

### The May 2023 Conference

187.    On May 11, 2023, Defendant Bensley, on behalf of Agilon, gave a presentation at the Bank of America Global Healthcare Conference. At the conference, Defendant Bensley acknowledged  the guidance, indicating that "we're very comfortable with our full year medical margin guidance, and we reaffirm that guidance." When asked to comment on Agilon's "very significant step-up in terms of medical margin PMPM," Defendant Bensley responded, "[T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024." He also touted

Defendants' "continued confidence . . . with [Agilon's] full year medical margin guidance."

### *The May 2023 Offering Documents*

188.    On May 17, 2023, the Company filed the May 2023 Prospectus for the May 2023 SPO with the SEC. Defendants Sell and Bensley reviewed and signed the May 2023 Offering Documents. The May 2023 Registration Statement touted that the Company's transformative business model  was "transforming healthcare by empowering [PCPs] to be the agents for change in the communities they serve." The May 2023 Registration Statement also highlighted that the PCPs were "best positioned to drive meaningful change in quality, cost, and patient experience when provided with the right infrastructure and payment model."

189.    The May 2023 Registration Statement also represented that the Company provided such an infrastructure and payment model, stating the following, in relevant part:

> Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements). The RBEs also contract with agilon to perform certain functions, and enter into  long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings *from successfully improving quality of care and reducing costs*.
>
> *Our business model is differentiated by its focus on existing community- based physician groups* and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

190.    Also, the May 2023 Registration Statement purported that the Company had appreciated "healthy" and "improving" Medical Margins on Agilon's road to profitability and positive cash flows.  For Fiscal Year 2022, the May 2023 Registration Statement stated that the Company had achieved a $305 million Medical Margin and $4 million adjusted EBITDA, while sustaining a $107 million net loss for the year, compared to a $407 million net loss in 2021. The May 2023 Registration Statement stated that for the first quarter of 2023, the Company had achieved Medical Margin of $162 million, compared to $86 million in the first quarter of 2022; net income of $16 million, compared to $1 million in the first quarter of 2022; and adjusted EBITDA of $24 million, compared to $8 million in the first quarter 2022. The May 2023 Registration Statement also noted that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

**The June 2023 Conference**

191.    On June 7, 2023, Defendants Sell and Bensley, on behalf of Agilon, gave a presentation to investors at the William Blair Growth Stock Conference. During his remarks, Defendant Sell touted the Company's purportedly care-focused business model, stating that "high-quality care is cost-effective care. When you drive that type of quality, senior patients spend less time in the hospital. They spend less time being readmitted into the hospital when they've been discharged and they spend less time entering the emergency department . . ." Defendant Sell further noted that the Company's "performance is driving growth" and its "simple flywheel" improved the Company's financial results over time.

192.    During the presentation, Defendant Bensley stated that the Company had seen "steady progress on medical margin upwards," a "tremendously high visibility to growth," and a

"really, really strong visibility into exactly what's happening." Defendant Bensley further represented that the Company had "tremendous embedded margins within each of our markets" and as its "members and . . . partners mature on the agilon platform, margins grow over time." Defendant Bensley also inflated that "we have really great confidence and visibility in our long-term value drivers. And right now, our EBITDA has actually been inflecting positive year-over-year."

193.    Defendant Bensley elaborated on the purported cohort maturity and superiority of the Company's business model, stating, in pertinent part, as follows:

> Again, ***we're just seeing tremendous inflection in these rates***. When you look at revenue growing at over 50% during this time period. You can see between Q1 2023 this year that we just reported Q1 more like a 74% growth in medical margin and revenue, and that resulted in about an 88% increase quarter – year-over- year for the first quarter in medical margin dollars. ***And you can see over time, our medical margin inflection has been tremendous  at about a 60% CAGR or certainly in line with what our revenue – I'm sorry, with what our membership CAGR has been, and we expect this year to generate somewhere around $550 million of medical margin***.

(Emphasis added).

194.    Defendant Bensley continued to highlight the high Medical Margin expectations by stating "we have moderated our medical margin outlooks by approximately $30 million to a range of $500 million to $530 million." Defendant Bensley explained that "our updated outlook reflects our decision to strengthen our [Medicare Advantage] reserves in 2023 while embedding a range of scenarios on utilization and cost trend."

195.    Finally, Defendant Sell stated, at the end of the presentation, that Agilon "had a really strong start this year." He continued, "I don't know many businesses that show an 88% step-up in their main margin metric. We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent."

### The June 2023 Competitor Revelations

196.    On June 13, 2023, UnitedHealth, a competitor of Agilon, disclosed that it was seeing "higher levels" of outpatient care activity. UnitedHealth suggested that higher utilization rates were caused by "pent-up demand or delayed demand being satisfied." UnitedHealth explained that it was "seeing very strong volumes" in areas, including ambulatory surgery, and an overall "higher number of cases that are being performed."

197.    On June 16, 2023, Humana, another competitor of Agilon, confirmed that it also was seeing "higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns."

### The August 2023 Earnings Release

198.    On August 3, 2023, the Company issued a press release announcing its second quarter financial results for the quarter ending June 30, 2023. The release stated that, for the second quarter, the Company had achieved a $138 million Medical Margin and $10 million adjusted EBITDA, while sustaining a $17 million net loss for the quarter. The release also represented that the "[d]urability of agilon[s'] partnership model [was] driving continued gains in profitability across Medicare Advantage and ACO REACH, inclusive of higher membership." In a quote, Defendant Sell echoed that sentiment, stating, "The durability and predictability of our partnership model enabled agilon to deliver strong performance during the second quarter and first half of 2023." The release decreased the midpoint of the Company's expected Medical Margin range for the year. Yet, at the same time, the Company raised the midpoint of its expected adjusted EBITDA

range, indicating that Agilon was improving its business model's profitability. As a result, the release represented that the Company was on track to achieve a $110 million to $125 million Medical Margin and ($8 million) to $0 adjusted EBITDA in the third quarter of 2023, and a $500 million to $535 million Medical Margin and $0 to $23 million adjusted EBITDA for Fiscal Year 2023.

199.     Defendant Sell, in an attempt to downplay the increasing costs, stated:

[I]n terms of leading indicators and visibility.  From an operational standpoint, we are not just receivers of macro utilization trends. Our teams are actively managing utilization on the ground every day. This includes transition of care nurses, post-discharge follow-up visits, and high-risk case managers. Additionally, while [Medicare Advantage] claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete. We have not seen any meaningful change in our expected cost trend, including outpatient procedures.

200.     During his remarks, Defendant Sell also stated, in pertinent part:

It should be noted that our medical margin for MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA, making our profitability gains even more outsized on an underlying basis.

*        *        *

[L]ooking forward from a guidance perspective, we have raised our membership revenue and adjusted EBITDA outlook for 2023.

201.     Defendant Sell addressed concerns that utilization rates were increasing across the industry which had arisen in connection with the provision of other healthcare providers' results. Defendant Sell dismissed the notion that these higher utilization rates were adversely impacting the Company. Instead, he claimed that Agilon's Total Care Model generated stronger results, "insulated" Agilon from heightened utilization rates, and lessened medical claims among its customer base. Defendant Sell stated, in pertinent part, as follows:

One theme I would like to drive home, given all of the speculation on utilization

67

trends is that different models will yield different outcomes. ***Agilon's model is distinctively different and more durable and predictable in driving cost and quality results compared to the broad fee-for-service system, which predominates across health care today***.

***Let me highlight how we are producing such strong and predictable results and what drives our forward confidence in the business***. First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care. We do not take risk on a broad set of patients in an unmanaged fee-for-service system. Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.

While our platform provides doctors with a consistent set of clinical resources like care managers, social workers and pharmacists, supported by technology and data insights. This allows our network to deliver consistent results across 500,000 attributed senior patients while our physician partners focus on the most complex 20% of patients that are driving 70% to 80% of total costs.

***We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization***.

(Emphasis added).

202.    Defendant Sell continued by stating the Company was in fact running ahead of

internal expectations for utilization rates in resistance of the industry trend. He stated, in pertinent

part, as follows:

Second point on differentiation. ***For our members, our year-to-date composite utilization trend is in line or better than our expectations. Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range***. Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.

All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and ***they are tracking ahead of our expectations year-to-date***.

(Emphasis added).

68

203.     Defendant Sell emphasized Agilon's purported strong visibility into utilization rates to give investors further confidence in Agilon's earnings estimates, stating the following, in relevant part:

> Third, **our model has natural advantages in terms of leading indicators and visibility**. From an operational standpoint, we are not just receivers of macro utilization trends. Our teams are actively managing utilization on the ground every day. This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers. Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete. **We have not seen any meaningful change in our expected cost trend, including outpatient procedures**.

(Emphasis added).

204.     Defendant Sell represented that the Company's profit-sharing relationship with its PCPs resulted in positive patient outcomes which "buffers our financial results up and down" and, as a result, enabled the Company to "guide to relatively tight ranges on medical margin and adjusted EBITDA and absorb puts and takes that may arise during a given period."

205.     Again, Defendant Sell touted the purported superiority of the Company's business model which had protected it from the higher cost environment affecting its competitors, stating, in pertinent part, as follows:

> **Ultimately, the durability and predictability of our model has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, even as some health plans with broad fee-for-service networks are seeing pockets of higher costs. Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability**.
>
> As we have discussed previously, we operate in a very forward-looking model. **And our visibility on the key levers for driving next year's performance is quite high**.
>
> *          *          *
>
> **Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023**. This is inclusive

of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.

***On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations***. This is obviously important as you think about the stepping off point for 2024.

Finally, we are increasingly confident in our ability to manage the new risk adjustment model starting next year. . . .

This is not something we had previously factored into our calculus on our ability to successfully manage the new risk model changes and this new information ***further underscores our confidence in 2024 and beyond***.

(Emphasis added).

206.    During his remarks, Defendant Bensley emphasized the actions that the Company had taken to minimize prior claim developments and stated that "the strength and durability of [Agilon's] business model has enabled us to . . . improve our adjusted EBITDA outlook." Defendant Bensley continued, stating that the Company's "updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend," but that these actions were "more than offset by stronger ACO REACH results and performance in our partner markets" and reflected a more conservative approach that "will support our performance in future years" and had allowed Agilon to raise its membership, revenue, and adjusted EBITDA ranges for the year. Defendant Bensley claimed that the Company was "strengthening [its] . . . reserves on a go-forward basis, which will significantly reduce the potential of negative claims development next year."

207.    In highlighting the high Medical Margin expectations, Defendant Bensley also stated "we have moderated our medical margin outlooks by approximately $30 million to a range of $500 million to $530 million." Defendant Bensley continued "[o]ur updated outlook reflects

our decision to strengthen our [Medicare Advantage] reserves in 2023 while embedding a range of scenarios on utilization and cost trend."

208.    Also during the call, Defendant Sell was asked to provide clarity on Agilon's visibility into cost trends. In response, Defendant Sell represented that Agilon had incredibly high visibility and confidence in the claims and utilization rates shared with investors, stating, in pertinent part, as follows:

> *So I think our visibility is extremely strong, Stephen, and we have high confidence. I think it's a function of our model, which is very different, right?* We are on the ground with PCPs every day, we are managing those most complex patients. And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs.
>
> The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER. And we put that together, *we're able to drive the type of results that I talked about with inpatient down in the flat to down in the mid-single-digit range.*
>
> From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims. And so there is incredibly high visibility. *There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis.*
>
> But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. And so we feel like we have an incredible level of visibility on that. *And I think the last thing I would just say is,* I think we've demonstrated that our model really stands out in higher utilization periods that broader fee-for-service markets are seeing.
>
> *              *              *
>
> *Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year. It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range.* So I think this is an area where we feel like we have incredible confidence. The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators.

209.    (Emphasis added).

*The August 2023 10-Q*

210.    On that same day, Agilon also filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter, which was signed by Defendant Bensley and also certified by Defendants Sell and Bensley as to the report's accuracy and completeness. In the Form 10-Q, Agilon claimed its costs incurred for medical services provided to patients was approximately $1.09 billion. Also, Agilon represented that there had been "no material changes to the risk factors disclosed in the [2022 10-K]." Moreover, the Form 10-Q included the financial results provided by the August 3rd press release and again represented that, as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

*The September 2023 Wells Fargo Conference*

211.    On September 6, 2023, Defendant Bensley, on behalf of Agilon, gave a presentation to investors at the Wells Fargo Healthcare Conference. At the conference, Defendant Bensley stated that the Company had "strengthen[ed] [its] reserves . . . to make sure that we're covering any potential increase in utilization and . . . make sure we're properly reserved as we end the year." Defendant Bensley also claimed that the Company was "confident in the guidance that [it] put out," in the second quarter of 2023.

212.    During his remarks, Defendant Bensley restated the strength and confidence in Agilon's guidance. In relevant part, Defendant Bensley stated:

> [I]t's really interesting when we came out in Q2 and said, hey, look, based on everything that's going on in the current environment, we're going to be a little bit more conservative with the [Medicare Advantage] side of it, and we actually lowered our [Medicare Advantage] medical margin net by about $30 million and

really offset that by taking our ACO REACH up -- the combination of those 2 changes, the sort of more conservative viewpoint on [Medicare Advantage]. And a really increased confidence, which I'll answer your question here in a second around ACO REACH, really gives us a huge amount of confidence in the guidance that we put out there. So, we're pretty confident with that kind of new mix that, we're confident in the guidance that we put out for -- at Q2 for 2023.

213.    In response to an analyst's question regarding utilization trends that Agilon was

seeing, Defendant Bensley represented that the Company's advanced business model had led to

significantly lower utilization rates which had purportedly increased Agilon's profitability.

Defendant Bensley stated, in relevant part, as follows:

I think you nailed it, though, by the way, the – obviously, there has been a lot of focus on utilization coming through the first half of the year. And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model. I know that sounds like it's simple, but *our model is essentially designed to have a more efficient and really more consistent impact on utilization than probably just any other model out there, just certainly the normal fee-for- service environment*.

If you think about it, we're coming in with this overall partnership model that drives this tremendous alignment with the primary care physicians that we partner with to really work on driving outcome over time. But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients *that then essentially over time does have that kind of leveling impact on utilization*.

*It also helps us drive utilization down below what the overall, I think, fee- for- service environment would be*. . . .

What we have much better continuity of care. We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen. I think that has the impact of both lowering utilization as well as having more consistent utilization over time. *It may even have a positive impact on avoiding some of the pent-up demand issues that came out of post-COVID*.

Having said that, you can see the results in our numbers. *So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side*. And by the way, of course, inpatient is by far the largest part of our cost basis. *We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in*

73

***Q2.***

Now at the same time, of course, we have been seeing pretty large increases in outpatient. ***That's a smaller portion of the overall cost pie. And so the inpatient*** decrease is more than offsetting that***.***

(Emphasis added).

***The September 2023 Morgan Stanley Conference***

214.   On September 12, 2023, Defendant Bensley attended a healthcare conference hosted by Morgan Stanley. At that conference, Defendant Bensley claimed that the Company had "strengthened [its] reserves." Defendant Bensley stated, in relevant part:

> If we do that at some point, see that, that -- there was some kind of a spike up or an increase in utilization that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there. . .. [W]e're well reserved and we feel really confident with the guidance -- with that guidance that we put forward for the balance of the year.

215.   The Individual Defendant's aforementioned statements referenced in ¶¶145-195 and ¶¶198-214 were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual defendants failed to disclose, *inter alia*, that: (i) the Company had suffered from materially higher utilization and medical claims rates as compared to previous year periods as patients who had delayed elective procedures during the COVID-19 pandemic sought treatment; (ii) the Company's business model had not insulated Agilon from these adverse cost trends, that worsened through the year, and Agilon was actually suffering cost trends that were 3x higher in certain key areas compared to 2022; (iii) due to the foregoing, the Company had suffered over $60 million in excess costs  related to the Company's medical services and millions in excess costs related to patient supplements benefits; (iv) thus, the Company lost tens of millions of dollars in prior year development claims; (v) resulting in the

74

Company's Medical Margins and adjusted EBITDA to be artificially inflated and materially misrepresented to the investing public; and (vi) finally, the Company's Medical Margin and adjusted EBITDA guidance, 2024 cash flow guidance, and the 2026 long-term guidance lacked in reasonable basis of fact and thus, was not achievable. As a result, Agilon's public statements were materially false and misleading at all relevant times.

### The 2022 Proxy Statement

216.    On April 11, 2022, Agilon filed the 2022 Proxy Statement notifying shareholders of the 2022 Annual Meeting of Shareholders, to be held on May 24, 2022. Defendants Schnall, Mansukani, Smith, Richards, Williams, Strum, Gourdine, McLoughlin, Sachdev, Sell, and Wulf solicited the 2022 Proxy statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

217.    The 2022 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Schnall, Mansukani, Smith, and Richards to the Board; (2) ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm for the Fiscal Year 2022; (3) the advisory vote approving the Company's executive compensation, and (4) the advisory vote on the frequency of future advisory votes on the compensation of the Company's named executive officers.

218.    Regarding the Company's Code of Conduct, the 2022 Proxy Statement provided, in relevant part:

> We have a Code of Conduct that applies to all of our officers, employees, and directors and a Code of Financial Ethics that applies to our Chief Executive Officer, Chief Financial Officer and corporate officers with financial and accounting responsibilities, including the Chief Accounting Officer, Treasurer, and any other person performing similar tasks or functions. The Code of Financial Ethics and the Code of Conduct each address matters such as conflicts of interest,

confidentiality, business practices, and compliance with laws and regulations. The Code of Financial Ethics and the Code of Conduct are available without charge at *https://investors.agilonhealth.com/governance/governance-documents/default.aspx*.

(Emphasis in original).

219.    Regarding the Board's role in "Risk Oversight," the 2022 Proxy Statement provided, in relevant part:

> Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies. The full board of directors has primary responsibility for evaluating strategic and operational risk management, and succession planning. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk. Our Compensation and Human Capital Committee evaluates risks arising from our compensation policies and practices, as more fully described below. Our Compliance and Quality Committee evaluates risks arising from our compliance with regulatory and legal requirements that pertain to the conduct of the day-to-day operations of our businesses (such as those dealing with Medicare, patient confidentiality, and other healthcare regulatory matters) and meets regularly with our chief compliance officer. The Audit Committee, Compensation and Human Capital Committee, and Compliance and Quality Committee provide reports to the full board of directors regarding these and other matters.

220.    Regarding the Audit Committee's responsibilities, the 2022 Proxy Statement provided, in relevant part:

> The principal purpose of the Audit Committee is to assist the board of directors in its oversight of our accounting practices, system of internal controls, audit processes, and financial reporting processes. The Audit Committee is responsible for appointing and retaining our independent auditor and approving the audit and non-audit services to be provided by the independent auditor, as well as overseeing the performance of the Company's internal audit function. The Audit Committee's function is more fully described in its charter.

Our management is responsible for preparing our financial statements and ensuring they are complete and accurate and prepared in accordance with generally accepted accounting principles. Ernst & Young LLP, our independent registered public accounting firm for the year ended December 31, 2021, was responsible for performing an independent audit of our consolidated financial statements and expressing an opinion on the conformity of those financial statements with generally accepted accounting principles.

The Audit Committee has reviewed and discussed our audited financial statements for the year ended December 31, 2021 with management and with Ernst & Young LLP. These audited financial statements are included in our Annual Report on Form 10-K for the year ended December 31, 2021.

The Audit Committee has also discussed with Ernst & Young LLP the matters required to be discussed by Auditing Standard No. 16 adopted by the Public Company Accounting Oversight Board (United States) regarding "Communications with Audit Committees."

The Audit Committee also has received and reviewed the written disclosures and the letter from Ernst & Young LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding Ernst & Young LLP's communications with the Audit Committee concerning independence and has discussed with Ernst & Young LLP its independence from us.

Based on the review and discussions described above, the Audit Committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2021 for filing with the SEC.

The Audit Committee

Karen McLoughlin (Chair)

Clay Richards

Michael Smith

This Report of the Audit Committee is required by the SEC and, in accordance with the SEC's rules, will not be deemed to be part of or incorporated by reference by any general statement incorporating by reference this proxy statement into any filing under the Securities Act of 1933, as amended, or under the Securities Exchange Act of 1934, as amended, except to the extent that we specifically incorporate this information by reference, and will not otherwise be deemed "soliciting material" or "filed" under either the Securities Act or the Exchange Act.

221.    Defendants Schnall, Mansukani, Smith, Richards, Williams, Strum, Gourdine, McLoughlin, Sachdev, Sell, and Wulf caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) the Company exaggerated the efficiency of Agilon's business model  and was unable to provide the cost savings and the mitigation of medical expenses represented to investors; (ii) the Company's purported historical cost savings portrayed to investors in connection with the IPO were short-term effects of the COVID-19 pandemic and therefore not indicative of the cost controls inherent to the Company's' aforementioned business model; (iii) due to the foregoing, Agilon suffered from a material, undisclosed risk of higher utilization and medical claims rates once the short-term effects of the pandemic subsided. As a result, Agilon's public statements were materially false and misleading at all relevant times.

222.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

223.    As a result of Defendants Schnall, Mansukani, Smith, Richards, Williams, Strum, Gourdine, McLoughlin, Sachdev, Sell, and Wulf causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Schnall, Mansukani, Smith, and Richards to the Board, allowing them to continue to breach their fiduciary duties to the Company.

*The 2023 Proxy Statement*

224.    On April 14, 2023, Agilon filed the 2023 Proxy Statement notifying shareholders of the 2023 Annual Meeting of Shareholders, to be held on May 24, 2023. Defendants Schnall, Schwaneke, Mansukani, Richards, Williams, Strum, McKenzie, McLoughlin, Sachdev, Sell, and Wulf solicited the 2023 Proxy statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

225.    The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Williams, Strum, McKenzie, and McLoughlin to the Board; (2) ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm for the Fiscal Year 2023; and (3) the advisory vote approving the Company's executive compensation.

226.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement provided, in relevant part:

> We have a Code of Conduct that applies to all of our officers, employees, and directors and a Code of Financial Ethics that applies to our Chief Executive Officer, Chief Financial Officer and corporate officers with financial and accounting responsibilities, including the Chief Accounting Officer, Treasurer, and any other person performing similar tasks or functions. The Code of Financial Ethics and the Code of Conduct each address matters such as conflicts of interest, confidentiality, business practices, and compliance with laws and regulations. The Code of Financial Ethics and the Code of Conduct are available without charge at *https://investors.agilonhealth.com/governance/governance-documents/default.aspx*.

(Emphasis in original).

227.    Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement provided, in relevant part:

> Our board of directors as a whole has responsibility for overseeing our risk

79

management. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies. The full board of directors has primary responsibility for evaluating strategic and operational risk management, and succession planning. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk. Our Compensation and Human Capital Committee evaluates risks arising from our compensation policies and practices, as more fully described below. Our Compliance and Quality Committee evaluates risks arising from our compliance with regulatory and legal requirements that pertain to the conduct of the day-to-day operations of our businesses (such as those dealing with Medicare, patient confidentiality, and other healthcare regulatory matters) and meets regularly with our chief compliance officer. The Audit Committee, Compensation and Human Capital Committee, and Compliance and Quality Committee provide reports to the full board of directors regarding these and other matters.

228.     Regarding the Audit Committee's responsibilities, the 2023 Proxy Statement provided, in relevant part:

Our Audit Committee is responsible, among its other duties and responsibilities, for overseeing our accounting and financial reporting processes, the audits of our financial statements, the qualifications and independence of our independent registered public accounting firm, the effectiveness of our internal control over financial reporting and the performance of our internal audit function and independent registered public accounting firm. Our Audit Committee is responsible for reviewing and assessing the qualitative aspects of our financial reporting, our processes to manage business and financial risks, and our compliance with significant applicable legal, ethical and regulatory requirements. Our Audit Committee is directly responsible for the appointment, compensation, retention and oversight of our independent registered public accounting firm. The charter of our Audit Committee is available without charge at https://investors.agilonhealth.com/governance/governance-documents/default.aspx.

The members of our Audit Committee are Karen McLoughlin (Chair), Jeffrey Schwaneke and Diana McKenzie. Our board of directors has designated Karen McLoughlin and Jeffrey Schwaneke as "audit committee financial experts," and each of the three members has been determined to be "financially literate" under the NYSE rules.

229.    Defendants Schnall, Schwaneke, Mansukani, Richards, Williams, Strum, McKenzie, McLoughlin, Sachdev, Sell, and Wulf caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) the Company exaggerated the efficiency of Agilon's business model and thus was unable to provide the cost savings and the mitigation of medical expenses represented to investors; (ii) the Company's purported historical cost savings portrayed to investors in connection with the IPO were short-term effects of the COVID-19 pandemic and therefore not indicative of the cost controls inherent to the Company's aforementioned business model; (iii) due to the foregoing, Agilon suffered from a material, undisclosed risk of higher utilization and medical claims rates once the short-term effects of the pandemic subsided. As a result, Agilon's public statements were materially false and misleading at all relevant times.

230.    The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (i) the Company had suffered from materially higher utilization and medical claims rates as compared to previous year periods as patients who had delayed elective procedures during the COVID-19 pandemic sought treatment; (ii) the Company's business model had not insulated Agilon from these adverse cost trends, that worsened through the year, and Agilon was actually suffering cost trends that were 3x higher in certain key areas compared to 2022; (iii) due to the foregoing, the Company had suffered over $60 million in excess costs  related to the Company's medical services and millions in excess costs related to patient supplements benefits; (iv) thus, the Company lost tens of millions of dollars in prior year development claims; (v) resulting in the Company's Medical Margins and adjusted EBITDA to be artificially inflated and materially misrepresented to the investing public; and (vi) finally, the Company's Medical Margin and adjusted EBITDA guidance, 2024 cash flow

guidance, and the 2026 long-term guidance lacked in reasonable basis of fact and thus, was not achievable. As a result, Agilon's public statements were materially false and misleading at all relevant times.

231.    The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

232.    As a result of Defendants Schnall, Schwaneke, Mansukani, Richards, Williams, Strum, McKenzie, McLoughlin, Sachdev, Sell, and Wulf causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Williams, Strum, McKenzie, and McLoughlin to the Board, allowing them to continue to breach their fiduciary duties to the Company.

### The Truth Begins to Emerge as the False and Misleading Statements Continue

233.    The truth began to emerge on November 2, 2023, when, after the market closed, Agilon issued a release announcing its third quarter financial results for the quarter ending September 30, 2023. Significantly, the Company's financial results revealed a steep decline in Agilon's Medical Margins, coming below analyst consensus estimates at just $108 million for the quarter, due in part to $9 million in previously unreported prior year claims. The Company also reported a net loss of $31 million for the third quarter of 2023. Additionally, the release disclosed

that Agilon suffered ($6 million) in quarterly adjusted EBITDA, which also missed analyst estimates. The release significantly lowered the Company's 2023 outlook for Medical Margins to a range of $455 million to $470 million compared to the expected $500 million to $530 million range.

234.    On that same day, on an earnings call, the Company's executives revealed that Agilon had suffered higher utilization rates earlier in the year, despite Individual Defendants' prior claims to the contrary. Already, the Company had significantly drawn down the reserves it had set aside earlier in the year to cover increased costs and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue.

235.    Defendant Sell stated that the reduction reflected in the Medical Margin guidance was "a step-up in Q2 utilization in [Medicare Advantage]" and the Company's expectation that utilization levels "will be flat through the end of the year." Defendant Sell further assured investors that the Company's more conservative approach to guidance "should reduce the risk of negative claims development next year."

236.    During the call, Defendants Sell and Bensley dismissed the Medical Margin overlook as related to the Company's underperforming Hawaii business, which it had sold off recently, and data issues from a single payor that had been largely resolved.

237.    In his remarks, Defendant Sell reassured investors that "[a]ll of [the Company's] key financial metrics were generally in line or above our guidance ranges, especially on an underlying basis," and Agilon's "results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth." Defendant Sell continued, in pertinent part, as follows:

Adjusted for Hawaii, our partner market EBITDA was positive $6 million for the quarter, well above our outlook. And it was even stronger on an underlying basis as our results included some net negative development from 2022. Our combined medical margin across MA partner markets and REACH was strong in the quarter, with MA generating $111 million and REACH generating $55 million. These results demonstrate the power of a PCP focusing on the most complex patients across their entire senior panel with differentiated information and care team resources.

238.    Defendant Sell continued that Agilon's "more conservative reserving approach" was "intentionally reflected in [its] medical margin outlook for MA and will support [its] future performance in 2024," and Agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model." Defendant Sell stated, "[w]e remain highly confident in the trajectory of our adjusted EBITDA inflection and expect to share an initial view in early January. As we have discussed previously, we operate in a very forward-looking model, and our visibility into the key drivers for next year's performance are quite high," which included the "attractive margin profile" of Agilon's new partners. Defendant Sell continued that the Company was "building reserves so that [it makes] sure we're adequately reserved."

239.    Regarding Agilon's underperformance on the Medical Margins for the third quarter 2023, Defendant Bensley purported that the "difference was primarily driven by performance in Hawaii" and that the "negative claims development this quarter was almost entirely isolated to system issues with a single payer related to supplemental benefit costs." Defendant Bensley also attempted to reassure investors that Agilon's increased reserves reflected a "more conservative reserving posture," as opposed to any fundamental collapse in the business. Defendant Bensley purported that this would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance." Defendant Bensley stated that the Company "continue[d]

to proactively refine [its] model to account for utilization trends as well as any potential blind spots with health plans."

240.    Defendant Sell, in response to analyst questions, denied that Agilon was experiencing abnormal utilization trends. Defendant Sell stated, "[f]rom a utilization perspective, composite utilization was in line with our overall expectations" and the temporary step up in utilizations had reverted to a "deceleration" and would be "flat through the end of the year." Also during the call, Defendant Sell stated that the increased reserves had taken any "issue around negative [prior year development] off the table" and "significantly mitigate the chance of any negative development into 2024."

241.    Additionally, Defendant Bensley added that utilization trends had "greatly started to moderate in June" and "continued to moderate in early Q3 as well." Defendant Bensley purported that this demonstrated the "strength of [the Company's] model." When asked how much of the reserve could be attributed to increased utilization and how much to the potential for prior year negative developments, Defendant Bensley responded: "[W]e've looked at the expense trend and tried to be appropriately conservative to try to make sure that we're preventing or at least minimizing the possibility of that happening again next year." Defendant Bensley also affirmed that 2024 would be "kind of a transition year into positive free cash flow."

242.    On that same day, the Company filed with the SEC its third quarter 2023 quarterly report on Form 10-Q, which was signed by Defendant Bensley and certified by Defendants Sell and Bensley as to the report's accuracy and completeness. The Form 10-Q included the financial results provided in the third quarter 2023 release. Also, the Form 10-Q stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars." The Form

10-Q also represented that Agilon's costs incurred for medical services provided to patients was approximately $992.5 million. Also, the Company claimed there had been "no material changes to the risk factors disclosed in the [2022 10-K]."

243.    On this news, the price per share of the Company's common stock price fell $2.23 per share, or 13%, from a closing price of $16.89 on November 2, 2023, to close at a price of $14.66 per share on November 3, 2023.

244.    After the markets closed on November 10, 2023, investors gained further insight into these issues when analysts with Wells Fargo Securities, LLC issued a report cutting its price target for Company common stock from $23.00 per share to $16.00 per share and reducing its financial estimates for Agilon. Analysts cited the "surprising" cost pressures impacting Agilon's medical margin in light of Individual Defendants' "continued confidence" in the Company's business model.

245.    On November 14, 2023, Defendants Sell and Bensley, on behalf of Agilon, gave a presentation to investors at the Wolfe Research Healthcare Conference. During his remarks, Defendant Sell stated:

> Today, we are reiterating our 2026 adjusted EBITDA target. This is our guidance with Geo entry costs, which is north of $530 million. . . . When you add back an expected geographic entry cost in '26 of $70 million, that nets to greater than $600 million, which is what we told you at our Investor Day back in March.

246.    Then, walking the investors through the adjustments that Agilon had made to its Medical Margin estimates for 2023, Defendant Sell stated that the walk down from a midpoint of $547 million in the original guidance to a midpoint of $463 million in the current guidance was due to $25 million in excess costs in the Hawaii market, $24 million in excess supplemental benefit costs, $13 million in core medical services costs, and $22 million in net prior year development

86

costs. Defendant Sell then attempted to reassure investors that the adverse costs trends were "moderating, May at $19 million, June at $8 million, July at $3 million." Additionally, Defendant Sell stated that Agilon remained on track to meet its 2023 and 2026 guidance because "we've doubled the company in the last couple of years and these members that are coming on the platform are starting at higher levels than what we've seen historically." Defendant Sell stated, in relevant part:

> [W]e're shifting from medical margin to specifically talking about cost trend. And what are our assumptions for the remainder of the year, specifically August through December? Our full year cost trend guidance is $90 million higher than our initial expectations. We are 90-plus percent complete on May, June and July and those costs were $30 millio n higher than expected. But as you can see, they are moderating.

247.    Similarly, Defendant Bensley stated that "as we came through July and June, those same [utilization cost] categories continue to moderate – moderated back down." He added, "[w]e didn't see like a huge spike up in utilization that's continue[d] . . . all 3 of them moderated back down." Later, in response to a question on whether the reserve action taken by the Company to date included a "decent amount of conservatism," Defendant Bensley responded that it did. Defendant Bensley ensured that Agilon was appropriately accrued and that there would be no more adverse surprises heading into 2024, stating in pertinent part as follows:

> Yes. I mean our objective is to say, hey, let's put enough into our outlook for the year to make sure that we're covering those – that potential that we could see actually higher utilization. So that's why we picked that right now, we picked that original 60 up to 90 when we saw what was actually coming through Q2. So that's what gets you that kind of $10 million incremental versus the asset that we would have given to go. But the idea is, yes, that we're going to end the year with that's going to be – put us in a very good position to be appropriately accrued for the year.
>
> You can look at it on a net basis, but there's no reason why we would expect to have. We shouldn't be going into a year with a significant underaccrual of our cost stand-alone either.

87

248.     The Company's failure in its periodic SEC filings during the Relevant Period to disclose the true nature of the Company's business model and the adverse utilization and cost trends being suffered by the Company, as well as the attendant impact to the Company's Medical Margin, adjusted EBITDA, ability to generate positive cash flows, and overall business and profitability, also violated Item 303, because these undisclosed facts were known to Individual Defendants and would have an unfavorable impact on Agilon's sales, revenues, and income from continuing operations.

249.     Additionally, the failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in the Company's securities speculative or risky. Indeed, the discussions of potential risks provided by Individual Defendants during the Relevant Period were themselves materially false and misleading, because they discussed potential future contingencies regarding potential variabilities in cost and claims rates, but failed to disclose that the Company had already been negatively impacted by tens of millions of dollars' worth of undisclosed adverse costs, which had materially adversely impacted the Company's financial results and business prospects.

250.     The truth continued to emerge on January 5, 2024, when the Company issued a press release revealing that Agilon had dramatically suffered higher medical expenses than previously revealed. As a result, Agilon was again lowering its 2023 expected Medical Margin to a range of $340 million to $360 million, or approximately $110 million, 24% below the already substantially reduced guidance and $200 million, 36% below the Company's original guidance due to "$90 million in higher-than-expected medical costs." The release also stated the Company's adjusted EBITDA had fallen to a range of ($69 million) to ($55 million) in 2023.  The release

withdrew the Company's 2026 guidance, which had been assuredly reaffirmed by Defendants previously and provided a bleak 2024 outlook which included just $560 million to $600 million in Medical Margin and an adjusted EBITDA range of $40 million to $70 million. The release acknowledged that:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions. While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

251.    Analysts at BTIG, covering Agilon, called the Medical Margin reduction "a significant negative surprise." Similarly, analysts at Leerink Partners reported that the results underscored blind spots in the Company's model and data visibility issues.

252.    On that same day, during an earnings call, Defendant Sell admitted that Agilon had failed to include the "elevated cost trends" in the forecast provided to investors, as well as the "magnitude and source of the utilization shifts."  Rather than the industry-leading utilization trends that Defendants had claimed throughout the Relevant Period and provided as an example of the validity of the Company's business model, Defendant Sell stated that Agilon was suffering "cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs."  Defendant Sell also represented that the increased utilizations, which would "persist through 2024," were due to a "backlog of pent-up demand from COVID." Defendant Bensley also admitted that Agilon was not on track to generate positive cash flow in 2024.

253.    Additionally, Agilon announced that Defendant Bensley would be stepping down as CFO of the Company.

254.    On this news, the price per share of Agilon common stock dropped $3.45 per share, or 28.6%, from a closing price of $12.08 on January 4, 2024, to close at a price of $8.63 per share on January 5, 2024.

255.    On February 8, 2024, the Company announced that its Chief Medical Officer ("CMO"), Benjamin Kornitzer, was stepping down from his position. As CMO, Kornitzer helped lead the Company's clinical strategy and oversee the Total Care Model while working with Agilon's physician partners.

256.    The statements in ¶¶234-243 and ¶¶245-247 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) the Company had suffered from materially higher utilization and medical claims rates as compared to previous year periods as patients who had delayed elective procedures during the COVID-19 pandemic sought treatment; (ii) the Company's business model had not insulated Agilon from these adverse cost trends, that worsened through the year, and Agilon was actually suffering cost trends that were 3x higher in certain key areas compared to 2022; (iii) due to the foregoing, the Company had suffered over $60 million in excess costs  related to the Company's medical services and millions in excess costs related to patient supplements benefits; (iv) thus, the Company lost tens of millions of dollars in prior year development claims; (v) resulting in the Company's Medical Margins and adjusted EBITDA to be artificially inflated and materially misrepresented to the investing public; and (vi) finally, the Company's Medical Margin and adjusted EBITDA guidance, 2024 cash flow guidance, and the 2026 long-term guidance lacked in reasonable basis of fact and thus, was not achievable. As a result, Agilon's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

257.     The truth fully emerged on February 27, 2024, when the Company issued a press release revealing that Agilon's medical costs and utilization rates were even higher than the already underwhelming results previously represented. Agilon revealed that its 2023 Medical Margin had come in at  $299 million for the year.  This was far lower than the already disappointing range of $340 million to $360 million previously provided weeks before.  Agilon also revealed an additional $38 million in net costs from the fourth quarter and $13 million in costs attributable to prior periods. Agilon further revealed a $263 million net loss for 2023 and a negative $95 million adjusted EBITDA for the year. This was a leap from the "meaningful step up in profitability" to a potential $90 million adjusted EBITDA gain originally claimed by Defendants during the Relevant Period. Agilon also slashed its 2024 Medical Margin guidance by 27% at the midpoint to a range of $400 million to $450 million (from $560-$600 million) and its 2024 adjusted EBITDA guidance from a $40 million to $60 million gain to a $15 million to $60 million loss.

258.     On that same day, the Company hosted an earnings call. During this call, Defendant's reveled that Agilon has been implementing substantial operational changes to combat its "data visibility gaps."

259.     As a result of this news, analysts continued to express their concern about the high medical costs that the Company had been facing. Specifically, on February 28, 2024, analysts at RBC Capital lowered their price target on the Company's stock from $11 to $8. The analysts noted that the Company's fourth quarter 2023 results were well below the pre-announced targets from early January and reduced 2024 guidance was based on sustained elevated utilization trends.

260.     On this news, the price per share of Agilon's stock fell $0.44 per share, or 7%, from a closing price of $6.48 on February 27, 2024, to close at a price of $6.04 per share on March 1,

2024.

## REPURCHASES DURING THE RELEVANT PERIOD

261.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

262.    According to the Form 10-Q the Company filed with the SEC on August 3, 2023, on May 18, 2023, the Company repurchased 9.6 million shares of its common stock for approximately $199,680,000 at an average price per share of approximately $20.80 per share. As the Company's stock was actually worth only $6.04 per share, the price at closing on February 27, 2024, the Company overpaid by approximately $141,696,000 for repurchases of its own stock.

## DAMAGES TO AGILON

263.    As a direct and proximate result of the Individual Defendants' misconduct, Agilon has lost and expended, and will continue to lose and expend, many millions of dollars.

264.    Such losses include the over $141 million the Company overpaid for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

265.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

266.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

267.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

268.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including the personal profits of the four Individual Defendants who engaged in lucrative insider sales, netting proceeds of approximately $14,143,022 during the Relevant Period.

269.    As a direct and proximate result of the Individual Defendants' conduct, Agilon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

270.    Plaintiff brings this action derivatively and for the benefit of Agilon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Agilon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

271.    Agilon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

272.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Agilon.

Plaintiff will adequately and fairly represent the interests of Agilon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

273.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

274.    A pre-suit demand on the Board of Agilon is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Schwaneke, Williams, McLoughlin, Sachdev, Wulf, Mansukani, McKenzie, Sell (the "Director-Defendants"), along with non-party Silvana Battaglia (collectively with the "Director-Defendants," the "Directors"). Plaintiff needs only to allege demand futility as to five of nine Directors who are on the Board at the time this action is commenced.

275.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

276.    Moreover, all the Director-Defendants solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect a majority of the Director-Defendants to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

277.    In complete abdication of their fiduciary duties, the Director-Defendants either

knowingly or recklessly caused or permitted Agilon to issue materially false and misleading statements. Specifically, the Director-Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

278.    Additional reasons that demand on Defendant Sell is futile follow. Defendant Sell serves as the Company's CEO, President, and as a Company director. Defendant Sell has served as the Company's CEO, President, and as a Company director since June 2020. The Company provides Defendant Sell with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Moreover, Defendant Sell solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Sell signed the 2021 and the 2022 10-Ks, as well as the certifications contained therein pursuant to SOX, both of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Sell engaged in lucrative insider trading, reaping personal profits exceeding $2,898,000. As the Company's CEO, President, and director, Defendant Sell was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the IPO Documents, the September 2021 Offering Documents, and the May 2023 Offering Documents, which he personally signed. As the Company's highest

officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Sell is a defendant in all three of the Securities Class Actions. For these reasons, too, Defendant Sell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

279. Additional reasons that demand on Defendant Schwaneke is futile follow. Defendant Schwaneke serves a Company director. Defendant Schwaneke has served as a Company director since August 2022. Defendant Schwaneke is also a member of the Audit and Nominating & Governance Committees and Chair of the Compensation and Human Capital Committee. Moreover, Defendant Schwaneke solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Schwaneke signed the 2022 10-K, which contained false and misleading elements, and attested to its accuracy. As a Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Schwaneke is a defendant in one of the three Securities Class Actions. For these reasons, too, Defendant Schwaneke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

280.     Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams is a co-founder of Agilon. Defendant Williams also serves as a Company director and as Chairman of the Board, positions which he has held since 2017. Moreover, Defendant Williams solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Williams signed the 2021 and the 2022 10-Ks, both of which contained false and misleading elements, and attested to their accuracy. As a Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Williams is a defendant in two of the three Securities Class Actions. For these reasons, too, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

281.     Additional reasons that demand on Defendant McLoughlin is futile follow. Defendant McLoughlin serves as a Company director. Defendant McLoughlin has served as a Company director since July 2021. Also, Defendant McLoughlin is the Chair of the Audit Committee and a member of the Compensation and Human Capital Committee and Nominating & Governance Committee. Moreover, Defendant McLoughlin solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their

fiduciary duties to the Company. In addition, Defendant McLoughlin signed the 2021 and the 2022 10-Ks, both of which contained false and misleading elements, and attested to their accuracy. As a Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, Defendant McLoughlin is a defendant in one of the Securities Class Actions. For these reasons, too, Defendant McLoughlin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

282.    Additional reasons that demand on Defendant McKenzie is futile follow. Defendant McKenzie has served as a Company director since February 2023. Also, Defendant McKenzie is a member of the Audit and Compensation and Human Capital Committees. Moreover, Defendant McKenzie solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, Defendant McKenzie is a defendant in one of the Securities Class Actions. For these reasons, too, Defendant McKenzie breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

283.    Additional reasons that demand on Defendant Sachdev is futile follow. Defendant Sachdev serves as a Company director and as Vice Chairman of the Board. Defendant Sachdev has served as a Company director since 2017. Moreover, Defendant Sachdev solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Sachdev signed the 2021 and the 2022 10-Ks, both of which contained false and misleading elements, and attested to their accuracy. As a Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Sachdev is a defendant in two of three Securities Class Actions. For these reasons, too, Defendant Sachdev breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

284.    Additional reasons that demand on Defendant Wulf is futile follow. Defendant Wulf serves as a Company director. Defendant Wulf has served as a Company director since 2017. Moreover, Defendant Wulf solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Wulf signed the 2021 and the 2022 10-Ks, both of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Wulf engaged in lucrative insider trading, reaping personal profits exceeding $2,938,397. As a Company director,

he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Wulf is a defendant in two of the three Securities Class Actions. For these reasons, too, Defendant Wulf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

285.   Additional reasons that demand on Defendant Mansukani is futile follow. Defendant Mansukani serves as a Company director. Defendant Sell has served as a Company director since 2017. Moreover, Defendant Mansukani solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Mansukani signed the 2021 and the 2022 10-Ks, both of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Mansukani engaged in lucrative insider trading, reaping personal profits exceeding $4,528,125. As a Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Mansukani is a defendant in two of the three Securities Class Actions. For these reasons, too, Defendant Mansukani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100

286.    Additional reasons that demand on the Board is futile follow.

287.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $141 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

288.    Defendants McLoughlin (as Chair), McKenzie, and Schwaneke (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.  Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

289.    In violation of the Code of Conduct the Director-Defendants conducted little, if

101

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to act with honesty and integrity; failed to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; failed to comply with applicable laws and regulations; failed to act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts; failed to promote ethical behavior at the Company; and failed to promptly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

290.    Agilon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Agilon any part of the damages Agilon suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

291.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

292.    The acts complained of herein constitute violations of fiduciary duties owed by Agilon's directors and/or officers, and these acts are incapable of ratification.

293.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Agilon. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Agilon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

294.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Agilon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

295.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

296.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

298.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

299.     Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's and the 2023 Proxy Statement's descriptions of the

Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

300.    The 2022 and 2023 Proxy Statements also failed to disclose that: (i) the Company exaggerated the efficiency of Agilon's business model and thus was unable to provide the cost savings and the mitigation of medical expenses represented to investors; (ii) the Company's purported historical cost savings portrayed to investors in connection with the IPO were short-term effects of the COVID-19 pandemic and therefore not indicative of the cost controls inherent to the Company's aforementioned business model; (iii) due to the foregoing, Agilon suffered from a material, undisclosed risk of higher utilization and medical claims rates once the short-term effects of the pandemic subsided. As a result, Agilon's public statements were materially false and misleading at all relevant times.

301.    Additionally, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (i) the Company had suffered from materially higher utilization and medical claims rates as compared to previous year periods as patients who had delayed elective procedures during the COVID-19 pandemic sought treatment; (ii) the Company's business model had not insulated Agilon from these adverse cost trends, that worsened through the year, and Agilon was actually suffering cost trends that were 3x higher in certain key areas compared to 2022; (iii) due to the foregoing, the Company had suffered over $60 million in excess costs related to the Company's medical services and millions in excess costs related to patient supplements benefits; (iv) thus, the Company lost tens of millions of dollars in prior year development claims; (v) resulting in the Company's Medical Margins and adjusted EBITDA to be artificially inflated and materially misrepresented to

the investing public; and (vi) finally, the Company's Medical Margin and adjusted EBITDA guidance, 2024 cash flow guidance, and the 2026 long-term guidance lacked in reasonable basis of fact and thus, was not achievable. As a result, Agilon's public statements were materially false and misleading at all relevant times.

302.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and the 2023 Proxy Statement, including, but not limited to, the election of Defendants Schnall, Mansukani, Smith, Richards, Williams, Strum, McKenzie, and McLoughlin to the Board

303.     As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted to re-elect Defendants Schnall, Mansukani, Smith, and Richards to the Board, thus allowing them to continue breaching their fiduciary duties to Agilon.

304.     As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to re-elect Defendants Williams, Strum, McKenzie, and McLoughlin to the Board, thus allowing them to continue breaching their fiduciary duties to Agilon.

305.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

306.     Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

307.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

308.    The Individual Defendants, by virtue of their positions with Agilon and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Agilon and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Agilon to engage in the illegal conduct and practices complained of herein.

309.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

310.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

311.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Agilon. Not only is Agilon now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Agilon by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $199 million worth of its own shares at artificially inflated prices, damaging Agilon.

107

312.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

313.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Agilon not misleading.

314.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as controlling shareholders, officers, and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Agilon.

315.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

316.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

317.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

318.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

319.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Agilon's business and affairs.

320.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

321.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Agilon.

322.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company had suffered from materially higher utilization and medical claims rates as compared to previous year periods as patients who had delayed elective procedures during the COVID-19 pandemic sought treatment; (ii) the Company's business model had not insulated Agilon from these adverse cost trends, that worsened through the year, and Agilon was actually suffering cost trends that were 3x higher in

certain key areas compared to 2022; (iii) due to the foregoing, the Company had suffered over $60 million in excess costs  related to the Company's medical services and millions in excess costs related to patient supplements benefits; (iv) thus, the Company lost tens of millions of dollars in prior year development claims; (v) resulting in the Company's Medical Margins and adjusted EBITDA to be artificially inflated and materially misrepresented to the investing public; and (vi) finally, the Company's Medical Margin and adjusted EBITDA guidance, 2024 cash flow guidance, and the 2026 long-term guidance lacked in reasonable basis of fact and thus, was not achievable. As a result, Agilon's public statements were materially false and misleading at all relevant times.

323.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

324.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

325.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Agilon's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the

scheme alleged herein and to prevent it from continuing to occur.

326.     In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase $199 million worth of shares of its own common stock at artificially inflated prices before the fraud was exposed, while four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $14 million.

327.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

328.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Agilon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

329.     Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

330.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

331.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Agilon.

332.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Agilon that was tied to the performance or artificially inflated valuation of Agilon, or received compensation or other

payments that were unjust in light of the Individual Defendants' bad faith conduct.

333.    Plaintiff, as a shareholder and a representative of Agilon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

334.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

335.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

336.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Agilon, for which they are legally responsible.

337.    As a direct and proximate result of the Individual Defendants' abuse of control, Agilon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

338.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

339.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

340.    By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Agilon in a manner consistent with the operations of a publicly-held corporation.

341.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Agilon has sustained and will continue to sustain significant damages.

342.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

343.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## EIGHTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

344.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

345.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

346.    In addition, the Individual Defendants caused the Company to repurchase $199 million worth of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

347.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

348.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## NINTH CLAIM

**Against the Individual Defendants for Contribution
Under Sections 11(f) of the Securities Act and Section 21D of the Exchange Act**

349.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

350.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Agilon shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

351.    Federal law provides Agilon with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

352.    The plaintiffs in the Securities Class Actions allege, *inter alia*, that the IPO Documents, the September 2021 Offering Documents, and the May 2023 Offering Documents contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

353.    Agilon is the registrant for the Offerings. The Individual Defendants were responsible for the contents and dissemination of the IPO Documents, the September 2021 Offering Documents, and the May 2023 Offering Documents.

354.    As issuer of the shares, Agilon is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

355.    The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Documents, the September 2021 Offering Documents, the

May 2023 Offering Documents, and other subsequent public filings were true and without omissions of any material facts and were not misleading.

356.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, officers, and/or directors of Agilon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Agilon, including the wrongful acts complained of herein and in the Securities Class Actions.

357.     Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

358.     As such, Agilon is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Agilon, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Agilon;

(c)     Determining and awarding to Agilon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Agilon and the Individual Defendants to take all necessary actions to reform and improve Agilon's corporate governance and internal procedures to comply with applicable laws and to protect Agilon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Agilon to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)      Awarding Agilon restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: May 16, 2024                              Respectfully submitted,

116

**THE BROWN LAW FIRM, P.C.**

<u>/s/Saadia Hashmi</u>
Saadia Hashmi
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net
         tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**<u>VERIFICATION</u>**

I, Douglas Dalton, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10t/h day of May, 2024.

*Dalton Douglas*
_____
Douglas Dalton